**DSE, INC., d/b/a Dayron,**
**Appellant/Cross–**
**Appellee,**

v.

**UNITED STATES of America,**
**et al., Appellees.**

Nos. 98–5265, 98–5368.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1999.

Decided March 12, 1999.

**22**

Kenneth A. Martin argued the cause and filed the briefs for appellant/cross-appellee.

Brian J. Sonfield, Assistant United States Attorney, argued the cause for the federal appellees. With him on the brief were Wilma A. Lewis, United States Attorney, Mark

E. Nagle and R. Craig Lawrence, Assistant United States Attorneys, Glenn P. Harris, Trial Attorney, United States Small Business Administration, and Ralph Avery, Litigation Attorney, United States Department of the Army.

Michael R. Charness and John G. Horan were on the briefs for appellee/cross-appellant. Donald J. Kissinger, Jr. entered an appearance.

Before: WALD, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Dae Shin Enterprises, Inc. ("DSE") brought a disappointed bidder action in the district court against the United States of America, seeking to enjoin performance of a procurement contract between the United States Army (the "Army") and the successful bidder, AMTEC Corporation ("AMTEC"). In support of its claim for injunctive relief, DSE alleged that a formal size determination of the Small Business Administration (the "SBA"), which found AMTEC to be "small" under its applicable regulations, was arbitrary and capricious in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). The district court granted a temporary restraining order and, after a series of evidentiary hearings, held that the SBA's actions were arbitrary and capricious. Accordingly, the district court granted a preliminary injunction and remanded the matter back to the SBA. In deliberating upon the appropriate injunction bond, the court took note of DSE's limited financial resources, the potential burden on the Army under its contract with AMTEC to provide compensation for any delay, and AMTEC's failure to provide sufficient documentation to the SBA. After balancing the prospective hardships, the court directed DSE to post a minimal bond and declared that AMTEC, who had intervened in the litigation and was deemed the party at fault, should not be entitled to compensation from the Army for any delay in the beginning of performance under the contract.

On remand, the SBA again found AMTEC to be a small business entity. Thereafter, the district court issued an order which dissolved the preliminary injunction and upheld the SBA's size determination. All other aspects of its previous order, including its assessment of the bond amount, were left in place. DSE appeals from this decision, alleging that, in several different respects, the SBA failed to follow its own regulations and adjudicatory precedent. This unexplained departure, it claims, was arbitrary and capricious, requiring us to set aside the SBA's size determination and to suspend performance of the contract. AMTEC filed a cross-appeal, contending that the district court lacked the authority to issue its no compensation order as the Tucker Act, *see* 28 U.S.C. §§ 1346, 1491, grants exclusive jurisdiction to adjudicate monetary claims founded upon a federal procurement contract to the United States Court of Federal Claims. Because the SBA's size determination constituted a reasonable application of the agency's regulations and accords with its previous decisions, we agree with the district court that the SBA's action was not arbitrary and capricious and that dissolution of the preliminary injunction properly followed. As for the no compensation declaration, the record reveals that the court entered it in conjunction with setting the appropriate security, as required by Rule 65(c) of the Federal Rules of Civil Procedure, to accompany the preliminary injunction. We affirm the district court's interlocutory order dissolving the preliminary injunction, of which the bond formed an inextricable part, but decline to opine as to the effect this finding may have in some speculative action on the contract brought in the Court of Federal Claims.

## I. BACKGROUND

On September 16, 1997, the Army issued a solicitation for bids to produce a detonation fuse styled as the M550 Escapement Assemblies, an essential component of its M-918 40 millimeter Projectile. The Army designated Solicitation No. DAAA09-97-R-0264 a total small business set-aside, and assigned it Standard Industrial Classification ("SIC") Code 3483. Under SBA regulations, a bid-

ding company can qualify as "small" for purposes of SIC Code 3483 if it has fewer than 1500 employees. *See* 13 C.F.R. § 121.201. The Army announced its intention to award the contract to AMTEC on January 21, 1998. Two days later DSE, a disappointed bidder next in line for the award and the incumbent producer, filed a protest with the contracting officer. Therein, it alleged that AMTEC did not qualify as a small business entity under SIC Code 3483, and that AMTEC's November 12, 1997 self-certification as small was erroneous. The Army contracting officer forwarded this challenge to the SBA's Office of Government Contracting Area Office (the "Area Office") for a formal size determination.

The Area Office reached a decision on February 9, 1998 (the "First Size Determination"). Based on the information provided by AMTEC in response to the SBA's formal request, the Area Office determined that AMTEC and its affiliates had fewer than 1500 employees at the time of AMTEC's self-certification. The SBA notified the Army of its decision, and the contracting officer awarded the contract to AMTEC. After filing an unsuccessful protest with the General Accounting Office, DSE brought suit in the U.S. District Court for the District of Columbia against the United States seeking a temporary restraining order against performance of the contract, a preliminary and a permanent injunction, a determination that AMTEC was a large business entity, and award of the production contract. In this action, DSE maintained that the SBA's First Size Determination was arbitrary and capricious for failing to count the personnel of various alleged affiliates in assessing the total number of AMTEC employees. On March 12, 1998, the Army ordered AMTEC to stop performance on the contract pending the outcome of the litigation. AMTEC then moved to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure, and the district court granted its motion.

When the Area Office became apprised that AMTEC may have had additional and undisclosed affiliates, it initiated another size protest. On April 16, 1998, the SBA concluded that AMTEC still qualified as a small business entity (the "Second Size Determination"). On April 23, 1998, after hearing oral argument, the district court granted a temporary restraining order and directed DSE to post a $5,000 bond. *See* 4/22/98 Transcript ("Tr.") at 94–103. Further evidentiary hearings followed, including extensive discussions as to the propriety of requiring DSE to post an additional bond. The court repeatedly expressed its view that DSE had performed a public service by coming forward, and that it would be unfair to saddle it with any additional monetary burden. In response, the government contended that any blame lay on AMTEC's shoulders, and that the Army needed protection against any future claims for the delay. *See* 4/30/98 Tr. at 95–111. On May 6, 1998, the court issued a preliminary injunction against performance on the contract, and ordered that "no compensation is due to AMTEC Corporation for any delay in the beginning of performance in the procurement contract because of the Court's finding that the delay in this matter is the fault of AMTEC's inadequate disclosures . . . ." *DSE, Inc. v. United States*, 3 F.Supp.2d 1464 (D.D.C.1998) (order granting preliminary injunction) (the "No Compensation Order").

In the memorandum opinion that accompanied the preliminary injunction, the district court found the SBA's Second Size Determination arbitrary and capricious and contrary to law, remanding the matter back to the SBA. The court based this conclusion on two separate grounds. First, it reasoned that the SBA "did not have all the necessary information before it when it made the determination." *DSE, Inc. v. United States*, 3 F.Supp.2d at 1470 (D.D.C.1998). Although the SBA relies heavily upon an applicant's voluntary disclosures when assessing size, AMTEC's President had testified that he was largely unfamiliar with both the SBA regulations governing affiliation and the extensive commercial holdings of those who owned AMTEC. The SBA itself had already concluded that the disclosures made in conjunction with the First Size Determination were inadequate. When AMTEC failed to divulge pertinent information concerning two asset acquisitions that it completed during the interlude between its self-certification

and receipt of the contract award, the court suspected that those underlying the Second Size Determination were equally insufficient.

While the SBA had been unaware of AMTEC's acquisitions at the time of its Second Size Determination, the agency insisted in its testimony before the court that they were irrelevant. While SBA regulations give present effect to "agreements in principle" which exist as of the date of self-certification, SBA officials asserted that they lacked the authority to investigate events occurring after that date. Rejecting this contention, the district court concluded that agency regulations not only permitted but required it to examine these transactions. Finding that the SBA erred in failing to investigate whether AMTEC had agreements in principle to acquire these companies as of the relevant date, the court remanded the matter to the agency for it to undertake that investigation.

On June 4, 1998, the SBA again found AMTEC to have been a small business as of the date of its self-certification (the "Third Size Determination"). After carefully reviewing the additional documentation submitted by AMTEC, the SBA concluded that there were no "unexecuted but final agreements" or "agreements in principle" in existence on November 12, 1997. With respect to each of the subsequent acquisitions, the SBA found that they had merely been in the negotiation stage as of that day; a number of unsettled material terms and conditions separated the parties, and the evidence was insufficient to establish that AMTEC had acquired any negative control over the targeted companies. Acknowledging the district court's determination that it had discretion to consider events occurring after a firm's self-certification, the SBA declined, on the facts before it, to exercise that discretion.[1] After a subsequent evidentiary hearing, the district court issued a June 18, 1998 Order which upheld the Third Size Determination, dissolved the preliminary injunction, and left all other aspects of its May 6, 1998 Order in place. *DSE, Inc. v. United States*, 20 F.Supp.2d 25, 27 (D.D.C.1998) (order dissolving preliminary injunction) ("*DSE II*"). DSE appeals from this Order, and AMTEC has lodged a cross-appeal.

## II. DISCUSSION

### A. Preliminary Issues

As an initial matter, AMTEC challenges this court's jurisdiction to hear DSE's claim on the grounds that DSE failed to exhaust administrative remedies available at the agency level. Pointing to SBA regulations, AMTEC observes that DSE had another level of administrative review available to it when it "abandoned" the administrative regime in favor of a judicial remedy—namely an appeal of the Area Office's size determination to the SBA Office of Hearings and Appeals ("OHA"). Because the necessity of exhaustion rests largely upon the statutory and regulatory framework that structures an agency's administrative procedure, we briefly delineate the governing regime before turning to the question of jurisdiction that it determines.

#### 1. The Regulatory Framework

The Small Business Act (the "Act") grants the SBA broad authority to craft general criteria for establishing which entities qualify as small business concerns, as well as to make particularized size assessments. *See, e.g.,* 15 U.S.C. § 632(a)(2)(A) ("the Administrator may specify detailed definitions or standards by which a business concern may be determined to be a small business concern"); 15 U.S.C. § 637(b)(6) ("It shall also be the duty of the Administration and it is empowered, whenever it determines such action is necessary—(6) to determine within any industry the concerns, firms ..., or other business enterprises which are to be designated 'small-business concerns' for the pur-

---

1. The SBA justified this conclusion by noting that: (i) it had not uncovered any evidence that AMTEC had acted fraudulently in its self-certification, nor that AMTEC had attempted to circumvent SBA regulations by postponing the acquisitions until after its selfcertification; and (ii) the Army had conveyed its view that any further delays in awarding the contract would undermine national security by jeopardizing the readiness of American military personnel. *See* Size Determination of AMTEC Corporation, No. 4–1998–20(r), at 2 (June 4, 1998) (the "Third Size Determination").

pose of effectuating the provisions of this chapter."). The Act further directs that other federal agencies "shall accept as conclusive the Administration's determination as to which enterprises are to be designated 'small-business concerns'...." 15 U.S.C. § 637(b)(6). The implementing regulations promulgated by the SBA establish applicable size standards on the basis of Standard Industrial Classification codes, each of which describes a particular economic sector and then specifies the maximum number of employees or annual receipts that a concern (and its affiliates) within that sector can have and still be considered small. See 13 C.F.R. § 121.201. In the government procurement context, the codes correspond to the principal purpose of the product or service being sought. See 13 C.F.R. §§ 121.107, 121.201.

The SBA regulations grant initiating authority to agency contracting officers, directing them to select the appropriate SIC code by considering which description of activity best describes the subject matter of the procurement. See 13 C.F.R. § 121.402(b). When submitting an initial offer or bid for a small business set-aside, a concern must include written self-certification that it qualifies as small under the specified SIC code as of the date of the submission. See 13 C.F.R. §§ 121.404–.405. "A contracting officer may accept a concern's self-certification as true for the particular procurement involved in the absence of a written protest by other offerors or other credible information which causes the contracting officer or SBA to question the size of the concern." 13 C.F.R. § 121.405(b).

Any disappointed offeror can make a size protest in connection with a particular procurement under the Small Business Set–Aside Program. See 13 C.F.R. § 121.1001(a)(1)(i). To avail itself of SBA review, the disappointed bidder must file a grievance with the contracting officer, setting out "sufficiently specific" allegations "to provide reasonable notice as to the grounds upon which the protested concern's size is questioned," 13 C.F.R. § 121.1007(b), within five days of receiving notice of the identity of the prospective awardee. See 13 C.F.R. §§ 121.1003, .1004(a)(2). The contracting of-

ficer "must forward the protest to the SBA Government Contracting Area Officer serving the area in which the headquarters of the protested concern is located...." 13 C.F.R. § 121.1003. Upon receiving a specific size protest, the SBA will contact the prospective awardee, providing a copy of the protest as well as the requisite SBA documents which must be filled out and returned within three working days. See 13 C.F.R. § 121.1008. If the awardee fails to make a timely response, the SBA may employ a negative inference that the missing information would reveal the firm to be other than small. See 13 C.F.R. § 121.1008(d). Where the awardee provides a timely response, the SBA Regional Office "will make a formal size determination within 10 working days, if possible" of receiving the original protest. 13 C.F.R. § 121.1009(a).

There is no appeal as of right from a formal size determination. See 13 C.F.R. § 121.1101. An individual adversely affected by an Area Office's decision, however, may file a petition seeking an appeal. See 13 C.F.R. § 134.302. In the context of a pending procurement, that individual must seek an appeal with the OHA within fifteen days from the formal size determination's release, see 13 C.F.R. § 134.304(a)(1), following which the prospective awardee has ten days to file an opposition to the appeal petition. See 13 C.F.R. § 134.309(b). "It is within the discretion of the [OHA Judge] whether to accept an appeal from a size determination." 13 C.F.R. § 134.303. See also 13 C.F.R. § 121.1101 ("OHA ... may, in its sole discretion, review a formal size determination made by a SBA Government Contracting Area Office...."). If the OHA accepts an appeal, its decision, upon issuance, constitutes the final decision of the SBA. That determination "becomes effective immediately and remains in full force and effect unless and until reversed by OHA." 13 C.F.R. § 121.1009(g)(1).

### 2. *Exhaustion*

 Under the Administrative Procedure Act (the "APA"), a party can seek judicial review from a final agency action without pursuing an intra-agency appeal unless required to do so by statute or by regulation.

*See generally Darby v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993); *see also Sendra Corp. v. Magaw,* 111 F.3d 162, 166 (D.C.Cir.1997) ("Parties therefore do not have to seek rehearing before they commence an action for judicial review, unless there is a statute requiring them to do so. . . ."). As *Darby* makes abundantly clear, "an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Darby,* 509 U.S. at 154, 113 S.Ct. 2539. By explicit terms, section 10(c) of the APA "has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates." *Id.* at 146, 113 S.Ct. 2539. *See* 5 U.S.C. § 704 ("agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined . . ., unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, [ ] an appeal to superior agency authority").

■ In an action brought under the APA, our inquiry is twofold. First, we examine the organic statute to determine whether Congress intended that an aggrieved party follow a particular administrative route before judicial relief would become available. If that generative statute is silent, as is the Small Business Act, we then ask whether an agency's regulations require recourse to a superior agency authority. Where an intra-agency appeal is discretionary, *Darby* teaches that "[c]ourts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become 'final' under § 10(c)." 509 U.S. at 154, 113 S.Ct. 2539.

AMTEC attempts to read SBA regulations as creating a mandatory appellate procedure, arguing that an aggrieved party cannot obtain a "final" agency decision without pursuing an appeal to the OHA.[2] The SBA regulations, however, cannot bear that con-struction. A decision from the OHA is final upon issuance, whether it declines to exercise the OHA's power of review or instead replaces an Area Office's size determination with a formal ruling. *See* 13 C.F.R. § 134.316(b) ("The decision [of the OHA] is the final decision of the SBA and becomes effective upon issuance."). Nevertheless, an Area Office decision can become final without receiving the OHA's imprimatur: "Unless OHA accepts a petition for review of a formal size determination, the size determination made by a SBA Government Contracting Area Office . . . is the final decision of SBA." 13 C.F.R. § 121.1101. Moreover, as *Darby* makes relevant, the filing of an appeal petition with the OHA does not render a size determination inoperative. Rather, a decision by the Area Office "becomes effective immediately and remains in full force and effect *unless and until* reversed by OHA." 13 C.F.R. § 121.1009(g)(1) (emphasis added). Since that decision is not rendered inoperative by a pending appeal to a "superior agency authority," a disappointed bidder need only make an initial size protest. Then, having exhausted the administrative remedies made necessary by SBA regulations, it can proceed in the federal courts seeking relief under the APA. Because DSE did just that, its claim is properly before us.

B. *The Small Business Administration's Third Size Determination*

■ DSE challenges the legality of the SBA's Third Size Determination on four separate grounds, broadly alleging that the agency failed to adhere to its own precedent in assessing the number of AMTEC employees. DSE further contends that the district court erred in finding the Third Size Determination not arbitrary and capricious. We review the disputed agency action *de novo,* and "proceed as if the [agency's] decision had been appealed to this court directly." *Dr. Pepper/Seven–Up Companies v. F.T.C.,* 991 F.2d 859, 862 (D.C.Cir.1993). Although the district court's decision on DSE's APA claim

---

2. Counsel for the SBA took a contrary position at oral argument, expressing the agency's belief that an OHA appeal is not a precondition to seeking judicial relief. In the SBA's opinion, DSE had exhausted the necessary administrative remedies before bringing this suit.

is not entitled to any particular deference, the agency's interpretation and application of its own regulations does merit our deference. In assessing the SBA's compliance with the prevailing APA standards, *see* 5 U.S.C. § 706(2)(A), our mantra is by now familiar. We ask whether the SBA's actions have been arbitrary or capricious, examining whether it has acted consistently with its previous applications of the governing regulations and whether the application of its general regulative doctrines to the specifics of this case has been reasonable. *See Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C.Cir.1997); *Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 616 (11th Cir.1985) (in disappointed bidder action, legality of agency action assessed by asking whether arbitrary and capricious). Finding the SBA's Third Size Determination to constitute a reasonable application of the agency's regulations that accords with its previous decisions, we reject each of DSE's contentions in turn.

### 1. *Acquisitions After the Self–Certification*

DSE first contends that the SBA Area Office's size determination was arbitrary and capricious in its refusal to give "present effect" to three acquisitions consummated in the two-month period following AMTEC's self-certification as small. In particular, DSE alleges that the SBA departed from both its own regulations and past precedent when it decided against including the employees of Allied Molded Products, Inc. ("Allied Molded"), Actown–Electrocoil, Inc. ("Actown"), and AEIC, Inc. ("AEIC") in assessing AMTEC's size. In DSE's view, the chronology of events surrounding these transactions reveal that AMTEC had reached what the SBA terms an "agreement in principle" to conclude each of the relevant acquisitions as of November 12, 1997. Mindful of our duty to take into account the agency's expertise in making such assessments, we cannot agree.

The SBA uses the date of self-certification as the general baseline against which to measure a firm's size. *See* 13 C.F.R. § 121.404 ("Generally, SBA determines the size status of a concern (including its affiliates) as of the date the concern submits a written self-certification that it is small to the procuring agency as part of its initial offer including price."). In addition to two enumerated exceptions to this background principle, neither of which applies here, SBA regulations also provide for giving "present effect" to certain transactions, treating them as if they had occurred prior to the date of selfcertification. The relevant provision appears as a part of the elaborate standards the SBA uses in determining whether or not associate entities qualify as affiliates for purposes of assessing size. 13 C.F.R. § 121.103 provides that:

(a) *General Principles of Affiliation.* (1) Concerns are affiliates of each other when one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both.

(2) SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists....

(d) *Affiliation arising under stock options, convertible debentures, and agreements to merge.* Since stock options, convertible debentures, and agreements to merge (including agreements in principle) affect the power to control a concern, SBA treats them as though the rights granted have been exercised.... SBA gives present effect to an agreement to merge or sell stock whether such agreement is unconditional, conditional, or finalized but unexecuted. Agreements to open or continue negotiations towards the possibility of a merger or a sale of stock at some later date are not considered "agreements in principle" and, thus, are not given present effect.

In its Third Size Determination, the SBA found AMTEC to have been affiliated with a series of other companies that, like itself, were owned by North American Fund II, L.P. ("Fund II"), a venture capital fund. The network of interlocking companies either owned by Fund II or controlled by those who control it is elaborate and rather complex. For purposes of deciding this case, however, we need only point out that as a result of

common ownership and control, the SBA deemed all companies owned or managed by Fund II and North American Fund III, L.P. ("Fund III") to be affiliates of AMTEC. *See* Third Size Determination at 4–5. The parties do not contest this finding; instead, their controversy centers around the acquisition of Actown and AEIC by Fund III, and of Allied Molded by AMTEC. Because the question of affiliation is time- and fact-specific, we briefly discuss the chronology of events surrounding each transaction.

Fund III and each of Actown and AEIC executed a Letter of Intent on October 23, 1997, in which the parties set forth their intention to enter into an acquisition agreement by the end of that year. The companies had begun negotiations months earlier, after a business search firm contacted Fund III with information regarding Actown and AEIC. After Fund III signed a confidentiality agreement that granted it access to Actown's business information, the companies continued to negotiate a general structure for the deal and a proposed purchase price. The Letter of Intent reflected the agreements that had been reached by October 23rd but, as the SBA Area Office found, did "not constitute a binding agreement or an agreement in principle to merge or acquire stock." *Id.* at 9. The SBA reached this conclusion based on the fact that "one key material term, the purchase price of $20 million, is merely 'contemplated' rather than agreed to, and is contingent on a number of variables including Fund III's determination as to [Actown's and AEIC's] financial prospects, existence of dividend payments, results of environmental studies, and adverse changes in the businesses." *Id.* The Letter of Intent also failed to resolve the liabilities that Fund III would incur upon closing, the impact of the acquisition upon Actown's employees, the negotiation of employment agreements, the method of financing, and the amount of equity and subordinated debt that Fund III would commit. The acquisition was expressly made contingent upon reaching a mutually acceptable agreement on these terms. Finally, as the SBA emphasized, the parties could walk away from the negotiations and terminate the Letter of Intent at any point during the process of due diligence without incurring any liability. *Id.* Negotiations continued during November, December and January, and the transaction was not consummated until January 13, 1998.

Turning to the acquisition of Allied Molded, the parties began negotiations in October of 1997 and signed a Letter of Intent during the week that followed AMTEC's selfcertification. This letter did contain a proposed price, but it was contingent upon various stated assumptions that AMTEC would have to verify. In addition to due diligence and environmental impact studies, the letter also noted that a number of significant issues remained outstanding—*e.g.,* noncompetition agreements, representations and warranties, conditions and indemnifications—and were to be the subject of further negotiations. Finally, the letter granted AMTEC the right to walk away at any point in time without incurring liability. In its Third Size Determination, the SBA concluded that "this letter is sufficiently nonbinding and tentative as to the material terms that it does not constitute an agreement to merge or acquire stock which SBA would give present effect under the regulation." Similarly, it held that the letter did not signify an "agreement in principle" as final agreement was "contingent on the acquiring [company's] due diligence and other variables . . .," and was not enforceable. *Id.* at 10. The parties reached final agreement in December, executing a Purchase and Sale contract on December 30, 1997.

With respect to each acquisition, DSE alleges that the SBA's Third Size Determination was arbitrary and capricious in its conclusion that there were neither agreements nor agreements in principle in place as of AMTEC's November 12th "small" self-certification. Drawing upon a series of previous SBA decisions, DSE alleges that agency practice can be distilled into a two-pronged rule: the SBA gives present effect to an acquisition agreement unless (i) a final agreement rests on conditions that are unusual, incapable of fulfillment, speculative or conjectural; or (ii) the probability that the transaction would ever be consummated is extremely low. We do not believe, however, that the SBA's cases can plausibly be read to state

such a "rule." DSE's attempted exegesis rests upon a selective misreading of SBA precedent.

Upon examination, none of the cases cited by DSE resemble the case at bar. In nearly all, the presence of a binding agreement or an agreement in principle was fully evident. The only question was whether the SBA would give present effect to that pre-existing agreement when the transaction it described would not be consummated until some point in the future. *See, e.g., Size Appeal of Consol. Indus., Inc.*, No. 4235 (SBA OHA 1997) (giving present effect to option agreement under which large entity could purchase all of Consolidated's stock at a set price); *Syro Steel*, No. 3800 (SBA OHA 1993) (where Articles of Incorporation, Agreement of Merger, Agreement and Plan of Merger had all been executed, and S–4 registration statement filed with the SEC seeking regulatory approval of merger, held that binding agreement had been reached at time of self-certification); *Dependable Courier Servs.*, No. 2110 (SBA OHA 1985) (giving present effect to a takeover when the companies had executed a Stock Purchase Agreement granting negative control over the target to the acquiring company and leaving formal completion subject only to minor contingencies); *Mark Wienert*, SBA No. 865 (1976) (as Board of Directors had each ratified Principles of Agreement, leaving only minor and routine conditions precedent to closing, present effect deemed appropriate). Here, by contrast, we are asked to review the propriety of the SBA's determination that no "agreement in principle" existed as to either acquisition by the date of self-certification. Conceptually, this question precedes any inquiry into whether such an agreement, if found, should be given present effect.

■ Given the fluidity of contemplated and evolving corporate transactions, which relegates any *post hoc* examination to a search for indicia of an agreement, we consider SBA expertise to be at its apex when determining whether an agreement in principle exists. We will not readily substitute our judgment for that of the agency, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), but will defer to its experience provided that the agency has offered a reasoned explanation for its decision, and that the result is in accord with material facts contained in the administrative record. The SBA's Third Size Determination easily satisfies this standard. With respect to the acquisitions of Allied Molded, Actown, and AEIC, the SBA explained that the companies had not reached an "agreement in principle" because the respective letters of intent failed to resolve important terms of conditions of the proposed transactions. Since this conclusion is consistent with SBA regulations, *see* 13 C.F.R. § 121.103(d) ("Agreements to open or continue negotiations toward the possibility of a merger or a sale of stock at some later date are not considered 'agreements in principle' and, thus, are not given present effect."), as well as prior SBA precedent, *see Size Appeal of Geosyntec Consultants*, No. 4277 (SBA OHA 1997) (refusing to give present effect to binding agreement reached four days after self-certification where target company had rejected a previous comprehensive bid but parties continued negotiating toward an accord), we will not disturb it.

### 2. *DSE's Additional Claims*

■ DSE's remaining challenges to the SBA's Third Size Determination are easily disposed of. First, DSE alleges that the SBA acted unlawfully in utilizing a full-time equivalency formula[3] to count the number of temporary workers used by AMTEC and its affiliates. The government conceded at oral argument that the SBA has always rejected the use of equivalency figures as inconsistent with its regulations requiring that a count include "all individuals employed on a full-time, part-time, temporary, or other basis," 13 C.F.R. § 121.106(a), and that "[p]art-time and temporary employees are counted the same as full-time employees." 13 C.F.R. § 121.106(b)(2). *See, e.g., Atlantic Plastic &*

---

3. "AMTEC and Deloitte & Touche calculated the number of [temporary workers] by reviewing the hours for which AMTEC had been billed by its temporary help services, and dividing by 40 (the number of hours in a work week)." Third Size Determination at 11.

*Chemical Co.*, No. 1290 (SBA SAB 1979), *aff'd on recons.*, No. 1299 (1979) (rejecting attempt to measure part-time employees by use of full-time equivalency formula) [4]; *Golden West Refining Co.*, No. 2132 (SBA OHA 1985) ("A review of the OHA's and Size Appeals Board's [ ] decisions concerning 'number of employees' shows that: the concern cannot count employees on an equivalency basis but must count as employees all full-time, part-time and temporary employees . . . ."). It is a settled tenet of administrative law that an agency cannot depart from a long-standing policy without providing sufficient explanation of its rationale for altering course. *See Simmons v. ICC*, 829 F.2d 150, 156 (D.C.Cir.1987); *Telecommunications Research & Action Ctr. v. FCC*, 800 F.2d 1181, 1184 (D.C.Cir.1986). However, it is equally well settled that the principle of harmless error applies to judicial review of agency action. *See* 5 U.S.C. § 706 ("In making the foregoing determinations [of whether agency action is arbitrary and capricious] . . . due account shall be taken of the rule of prejudicial error."); *Doolin Sec. Sav. Bank, FSB v. Office of Thrift Supervision*, 139 F.3d 203, 212 (D.C.Cir.1998).

■ Under the APA, we will not set aside agency action unless "the party asserting error [can] demonstrate prejudice from the error," *Air Canada v. Department of Transp.*, 148 F.3d 1142, 1156 (D.C.Cir.1998), a burden that DSE has conspicuously failed to meet. In the Third Size Determination, the SBA determined that AMTEC and its affiliates had a total of 1413.19 employees for the twelve months preceding AMTEC's self-certification as small. *See* Third Size Determination at 12. Of these, only 44.54 were

classified as temporary employees. *See id.* In the evidentiary hearings before the district court, AMTEC introduced additional testimony from its Deloitte & Touche accountant that counted temporary employees based on the actual number of individuals used—the same "head count" method used to measure the number of full-time and part-time employees. According to the accountant's testimony, AMTEC and its affiliates had 1428.30 employees during the relevant time period. *See* 6/15/98 Tr. at 10–13; *DSE II* at 26. In other words, an actual head count assigned fifteen additional employees to AMTEC, but left it well short of the 1500 allowed for this procurement under SIC Code 3483. Although this information was never presented to the SBA, DSE did have the opportunity to cross-examine AMTEC's witness, and to introduce any evidence to the contrary. DSE failed to provide us with any reason to believe that it could ever show this revised count to be erroneous. Accordingly, we find the agency's error to have been harmless.[5] *Cf. State of North Carolina v. FERC*, 112 F.3d 1175, 1191 (D.C.Cir.1997) (although FERC utilized erroneous data, error was harmless as petitioner could not show that revised data would alter the Commission's projection).

■ DSE next contends that the SBA was arbitrary and capricious in its failure to investigate whether the general partners of North American Company, Ltd.—a limited partnership—had other commercial interests that should have been considered affiliates of AMTEC. The record belies this assertion. As required by its regulations, *see* 13 C.F.R. § 121.103(a)(1), (4), the SBA examined all of the holdings of North American Company's

---

**4.** When *Atlantic Plastic* was decided, the governing regulation, then 13 C.F.R. § 121.3–2(t), provided that: "Number of employees means the average employment . . . based on the number of persons employed on a full-time, part-time, temporary or other basis during each of the pay periods of the preceding 12 months." The regulation currently provides, in almost identical terms, that: "Employees counted in determining size include all individuals employed on a full-time, part-time, temporary, or other basis."

**5.** DSE further contends that we should not allow the testimony before the district court to rehabilitate the Third Size Determination, as "[i]t is a

widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C.Cir.1997). While it is true that the accountant's testimony had not been presented to the SBA, we have not utilized his estimations in reviewing the agency's size determination. The SBA clearly erred. It is equally clear, however, that its error was harmless. It would be an empty formality for us to remand the matter back to the SBA, a waste of time and resources that we decline to order.

managing general partner, the individual who controlled its activities. *See* Third Size Determination at 4–8. *Quantrad Sensor, Inc.,* SBA No. 4255 (SBA OHA 1997), cited by DSE for the proposition that the SBA should have gone on to examine the holdings of the other partners as well, does not provide to the contrary. In *Quantrad,* the OHA held that the SBA *could* request information from a *general* partnership's general partners, not that it was under an obligation to do so. In fact, in *Size Appeal of Interactive Resources, Inc.,* No. 3168 (SBA OHA 1989), relied upon by the Area Office in *Quantrad,* the OHA explicitly held that:

> In a *limited* partnership, each partner's liability is limited, except that of the General Partner. A General Partner in a limited partnership has all the rights and powers of a General Partner in a General Partnership. Thus, a General Partner in a limited partnership is also presumptively in control of the limited partnership for purposes of the affiliation regulation.

(Emphasis added). Having examined the holdings of North American Company's general partner, the SBA was under no obligation to make any further inquiries.

Finally, DSE alleges that the SBA should have determined whether a joint venture between North American Company and another business, Allied Capital Commercial Corporation, received financial assistance from the SBA. We disagree. While 13 C.F.R. § 121.103(f)(1) provides that "[p]arties to a joint venture are affiliates if any one of them seeks SBA financial assistance for use in connection with the joint venture," there was no evidence that any SBA funds had been used in connection with the North American–Allied Capital project. In testimony before the district court, which occurred

prior to the Third Size Determination and at which the SBA was represented, the controlling partner of North American Company testified that the joint venture in question had no relationship whatsoever with the SBA. Given the SBA's general reliance upon the parties' voluntary disclosure of relevant information, *see* 13 C.F.R. § 121.405(a)-(b), policed by "severe criminal penalties for knowingly misrepresenting the small business size status of a concern ... [or] for knowingly making false statements or misrepresentations to SBA," 13 C.F.R. § 121.108, we do not see how it had any obligation to investigate further.

Accordingly, we conclude that the SBA's Third Size Determination was not arbitrary and capricious. We also affirm the district court's interlocutory order dissolving the preliminary injunction against performance on AMTEC's contract with the Army.[6] *See DSE II* at 27. As our discussion well illustrates, the court properly concluded that DSE had little to no likelihood of prevailing on the merits of its claim.

## C. *The "No Compensation Order"*

Jurisdiction to adjudicate monetary claims founded upon any express or implied contract with the United States rests primarily in the United States Court of Federal Claims. *See* 28 U.S.C. § 1491. Although the federal district courts have concurrent jurisdiction when the amount in controversy is $10,000 or less, the Court of Federal Claims has exclusive jurisdiction over claims exceeding $10,000, *see* 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 1491; *Auction Co. of America v. FDIC,* 132 F.3d 746, 749 (D.C.Cir.1997), as well as over claims "which are subject to sections 8(g)(1) and 10(a)(1) of the Contract

---

**6.** Although the district court did not enter a formal judgment for the United States in conjunction with its June 16th Order, the court clearly assumed that the Order fully resolved and terminated the proceedings before it. *See, e.g.,* 6/9/98 Tr. at 6 ("I got to finish this thing here."); 6/15/98 Tr. at 28 ("this thing has got to come to a conclusion."); *DSE II* at 26 ("In short, the Court has done everything it can to ensure that the Plaintiff received a careful and accurate decision from the SBA."). Because the plaintiff's Complaint additionally sought a permanent injunction and other equitable relief, this case will not

be formally concluded until the court enters judgment in favor of the United States in accordance with Rule 58 of the Federal Rules of Civil Procedure. *See* FED.R.CIV.P. 58; *United States v. Haynes,* 158 F.3d 1327, 1329 (D.C.Cir.1998) (separate document requirement of Rule 58 must be mechanically applied). In light of our holding that the SBA's Third Size Determination was not arbitrary and capricious, no further relief is available to the plaintiff. Accordingly, we will remand the matter to the district court to take whatever procedural steps are necessary to render a formal and final disposition.

Disputes Act of 1978." 28 U.S.C. § 1346(a)(2). Since the Contract Disputes Act applies, *inter alia,* to contracts entered into by an executive agency for the procurement of property, *see* 41 U.S.C. § 602(a), the Court of Federal Claims has exclusive jurisdiction over monetary disputes arising out of such contracts. Had the district court's No Compensation Order sought to render a final adjudication of AMTEC's potential monetary claims against the government under their contract, it seemingly would have exceeded this jurisdictional proscription. Because we do not believe that the district court's Order had this intention or effect, however, we need not determine whether it adjudicated what is "at its essence a contract action." *Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 4 (D.C.Cir.1998) (internal quotations omitted). *Compare Megapulse, Inc. v. Lewis,* 672 F.2d 959, 969 (D.C.Cir. 1982) (where plaintiff seeks injunctive relief against the Coast Guard under the Trade Secrets Act to prevent dissemination of technological information, mere fact that dispute is contract-related does not convert it into an action based on the contract) *with Ingersoll–Rand Co. v. United States,* 780 F.2d 74 (D.C.Cir.1985) (plaintiff cannot avoid Contract Disputes Act by claiming that Air Force's decision to terminate its contract was arbitrary and capricious and in violation of Federal Acquisition Regulations).

The district court entered the No Compensation Order in conjunction with its decision to grant a temporary restraining order and then later a preliminary injunction. In light of the circumstances surrounding its issuance, we view the No Compensation Order as part and parcel of the preliminary injunction order itself. Under Rule 65(c) of the Federal Rules of Civil Procedure, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." FED.R.CIV.P. 65(c). The language "in such sum as the court deems proper" has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond. *See, e.g., Federal Prescription Serv., Inc. v. American Pharm. Ass'n,* 636 F.2d 755, 759 (D.C.Cir.1980) (discussing the widely recognized discretion that a district court granting temporary injunctive relief has with respect to the security requirement of Rule 65(c)); *Carillon Importers, Ltd. v. Frank Pesce Int'l Group Ltd.,* 112 F.3d 1125, 1127 (11th Cir.1997) (same). The district court entered the No Compensation Order in its exercise of the broad equitable authority granted by Rule 65(c).

An examination of the record reveals that the court had extensive discussions with the parties as to both the propriety of requiring DSE to post a bond and the appropriate amount. Before issuing the temporary restraining order, and again before issuing the preliminary injunction, the court expressed its belief that DSE had rendered a public service in challenging AMTEC's size. *See* 4/30/98 Tr. at 97–111. Given DSE's diminutive size and limited financial resources, the court sought to fashion a way to limit DSE's potential exposure while simultaneously requiring a bond sufficient to compensate the government in case the award was later found to have been wrongfully enjoined.[7] It ultimately decided to balance the equities by requiring DSE to post a $5,000 bond, and

---

7. The following exchange exemplifies the court's and the parties' varying concerns:

> U.S.: Then we need a bond, Your Honor.
> Court: You need a bond from these people who are going to get nothing out of this thing maybe?
> U.S.: No, Your Honor. If the SBA determines that AMTEC is again qualified to get the contract and the Army has been stopped for this long period of time, with damages, AMTEC is going to submit a claim for $3,000 a day. If we have been stopped—
> Court: And these people have to pay for it after they do a public service?

> U.S.: Your Honor, if it's improvidently issued because they were small, anyway, if the SBA finds them to be small on the remand, they're damaged....
> Court: This is Alice in Wonderland....
> U.S.: Well, if you merely want to remand the decision to the SBA, the Army will proceed with the contract performance. If you don't want contract performance to proceed, then we need to be protected from the damages of the delay, in the event that the SBA finds that they're still small and they should have been going forward in the meantime. The value of this time is hurting the Army....

then limiting the government's potential damages as a result of delay in performance on the contract by declaring that AMTEC, who it considered to be the party at fault, could not recover for losses caused by the injunction.

Because the No Compensation Order formed a part of the preliminary injunction order, and we have jurisdiction under 28 U.S.C. § 1292(a)(1)[8] to review the court's interlocutory order dissolving the injunction, we necessarily have jurisdiction to hear AMTEC's cross-appeal. However, since we do not believe that the court's declaration in any way constitutes an adjudication of AMTEC's rights under its procurement contract, the Tucker Act does not speak to the propriety of the district court's June 16, 1998 interlocutory order. We express no opinion as to the effect its declaration will have in any future litigation between AMTEC and the government, leaving it to the Court of Federal Claims to adjudicate their respective rights under the contract should a dispute subsequently arise. As AMTEC has offered no other basis for its cross-appeal, we affirm the district court's order dissolving the preliminary injunction.

### III. CONCLUSION

For the foregoing reasons, we uphold the Small Business Administration's Third Size Determination and affirm the district court's Order dated June 16, 1998. We remand the matter to the district court for the purpose of entering a formal judgment for the United States.

*So ordered.*

Court: But I don't think these people who are the whistle-blowers, should have to put up a bond at this stage because I don't think that they did the wrong thing by coming forward....
Let me point something out to you. There's a problem here. We see what the problem is and we don't have to use an atomic bomb here. There was no fraud. Nobody was trying to deceive. You heard it as I heard it. You heard that the problem was [AMTEC's President] went ahead and he didn't know what the

heck he was doing, Lansing. He was in a field that he shouldn't have been in.
U.S.: I understand, Your Honor. I'm just trying to protect an innocent bystander.
4/30/98 Tr. at 101–06.

8. "[T]he courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the *district courts of the United States* ..., *or of the judges thereof*, granting, continuing, modifying, refusing or dissolving injunctions...." 28 U.S.C. § 1292(a)(1).