**BLUE BIRD COACH LINES, INC., et al., Plaintiffs,**

v.

**Administrator Gordon J. LINTON, Federal Transit Administration, Defendant.**

**No. Civ.A. 98–1967(JR).**

United States District Court, District of Columbia.

May 26, 1999.

---

Jeremy Kahn, Kahn & Kahn, Washington, DC, for plaintiffs.

Paul S. Padda, Assistant U.S. Attorney, Washington, DC, for defendant.

### MEMORANDUM

ROBERTSON, District Judge.

The Federal Transit Administration ("FTA") Administrator determined that a public shuttle bus service to football and basketball games was "mass transportation" within the meaning of the FTA Act, 49 U.S.C. § 5301 et seq. (formerly known as the Urban Mass Transportation Act). Plaintiffs, who are providers of charter bus service, complain that the FTA determination was unlawful and that they have been injured by it. Both sides have moved for summary judgment. Because I cannot find that the FTA determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), I must deny plaintiffs' motion and award judgment to the government defendant.

#### Background

In 1997, the Rochester–Genessee Regional Transit Authority ("RGRTA"), a recipient of FTA funds, launched a roundtrip "shuttle service" to carry passengers from the Rochester area to football and basketball games in Buffalo (150 miles roundtrip) and Syracuse (190 miles roundtrip) respectively. A.R. 176. The widely-advertised $15 service was open to the general public. No advance reservations were necessary. The buses departed Rochester several hours before game time. When the buses arrived at the stadium parking lot, passengers were reminded of their bus numbers so that they could return to Rochester on the same bus that carried them to the

game. Shuttle buses would depart for the return trip forty-five minutes after the game ended, or when all the passengers were accounted for.

On October 28, 1997, plaintiffs Blue Bird Coach Lines, Inc. and Kemp Bus Service, Inc., private charter bus service providers, A.R. at 169–170, complained to the FTA Region 2 Administrator about the RGRTA shuttle service. A.R. 168. They asserted that RGRTA had in fact begun a "charter service" that did not meet the requirements of § 5323(d) or the charter regulations issued thereunder, 49 C.F.R. § 604. A.R. 172. Specifically, they asserted that the shuttle service provided charter bus transportation service outside the urban area in which RGRTA "regularly provides scheduled mass transportation service," A.R. 171, and "engag[ed] in charter service where private companies are ready and willing to provide such service," in violation of 49 U.S.C. § 5323(d)(1). The plaintiffs alleged that RGRTA was seeking to "expand its Federally funded services well beyond the purpose for which funding was made available, in direct competition with private carriers." A.R. 174.

On February 27, 1998, the Regional Administrator dismissed the complaint after concluding that the shuttle service was "mass transportation" that was not subject to the statutory provisions and Charter Regulations concerning "charter service." Plaintiffs appealed to the FTA Administrator on March 12, 1998.

Seven months later, on October 9, 1998, the FTA issued a final decision affirming the initial decision of the Regional Administrator—that the game shuttle service was "mass transportation" within the meaning of 49 U.S.C. 5302(a)(7)—and dismissing the plaintiffs' administrative complaint. A.R. 1–2 (Letter from Gordon J. Linton, (Oct. 9, 1998)).

The amended complaint, challenging the FTA's decision as "arbitrary and capricious," was filed on October 26, 1998.[1]

*Analysis*

■■■ The FTA Act does not create a private right of action, and none can be implied. *American Coach Lines, Inc. v. Skinner,* Civ. Act. No. 90–1361 (D.D.C. Jul. 31, 1991). The plaintiffs' claim may, however, be considered under the APA. *See Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District,* 752 F.2d 373, 378 (9th Cir.1985). Plaintiffs satisfy the APA standing requirement because the interests they seek to advance are within the zone of interests that the FTA Act was intended to protect:

> *Condition on charter bus transportation service.*—(1) Financial assistance under this chapter may be used to buy or operate a bus only if the applicant, governmental authority, or publicly owned operator that receives the assistance agrees that, except as provided in the agreement, the governmental authority or an operator of mass transportation for the governmental authority *will not provide charter bus transportation service outside the urban area in which it provides regularly scheduled mass transportation service.* An agreement shall provide for a fair arrangement the Secretary of Transportation considers appropriate to *ensure that the assistance will not enable a governmental authority or an operator for a governmental authority to foreclose a private operator from providing intercity charter bus service if the private operator can provide the service.*

Section 5323(d) (emphasis added). *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Plaintiffs' standing is indeed expressly recognized by the Charter Regulations, which permit an "interested party."—"an individ-

---

1. The original complaint in this action, filed August 13, 1998, complained of the delay in FTA's appeal process and sought an order compelling FTA to "follow [its] own rules and promptly issue a decision on the merits of their [a]ppeal." Complaint at 10–11 ¶ 35.

ual, partnership, corporation, association, or public or private organization that *has a financial interest which is adversely affected by the acts or acts of the recipient regarding charter service,*" 49 C.F.R. § 604.3(j) (emphasis added)—to file a complaint if it "believes that a recipient [public transit authority] is in violation of the requirements of [the Charter Regulations]." § 604.15(a). *See also* § 604.21 ("The Regional Administrator's decision, or the Administrator's decision on appeal ... is subject to judicial review pursuant to sections 701–706 of [the APA]."). That plaintiffs have standing is also supported by their allegation of an injury-in-fact and the FTA Act's lack of any provision barring judicial review.[2]

■ In determining whether the Administrator's determination was arbitrary and capricious, I may not substitute my judgment for that of the agency, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), but rather must "defer to [FTA's] experience provided that the agency has offered a reasoned explanation for its decision, and [the agency's] result is in accord with material facts contained in the administrative record." *DSE, Inc. v. United States,* 169 F.3d 21, 30 (D.C.Cir.1999).

■ The FTA Act defines "mass transportation," § 5302(a)(7),[3] and the Charter Regulations define "charter service," 49 C.F.R. § 604.5(e).[4] The FTA has described three elements distinguishing "mass transportation" from "charter service":

> First, mass transportation is *under the control of the recipient.* Generally, the recipient is responsible for setting the route, rate, and schedule and deciding what equipment is used. Second, the service is *designed to benefit the public at large* and not some special organization such as a private club. Third, mass transportation is *open to the public* and is not closed door. Thus anyone who wishes to ride on the service must be permitted to do so.

52 Fed.Reg. 11916, 11920 (Apr. 13, 1987) (emphasis added). *See also* 52 Fed.Reg. 42248, 42252 (discussing "charter service"). The FTA has applied this interpretation as a three-factor balancing test, *see Seymour Charter Bus Lines v. Knoxville Transit Authority,* TN–09/88–01 (Nov. 29, 1989); A.R. 36, and it applied the same test to the facts presented by this case to determine that the RGRTA shuttle service was "mass transportation."

First, the shuttle service is controlled by the RGRTA, and not by the group of passengers who choose to go to a particu-

**2.** Plaintiffs thus satisfy this Circuit's "three-part test [for] determin[ing] whether a party has standing to obtain review of agency action: (1) the complainant must allege injury in fact; (2) the complainant must assert that arbitrary or capricious agency action injured an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) there must be no 'clear and convincing' indication of a legislative intent to withhold judicial review." *National Treasury Employees Union v. United States Merit Sys. Protection Bd.,* 743 F.2d 895, 910 (D.C.Cir.1984).

**3.** The FTA Act defines "mass transportation" as "transportation by a conveyance that provides regular and continuing general *or special* transportation to the public, but does not include schoolbus, charter, or sightseeing

transportation." 49 U.S.C. § 5302(a)(7) (emphasis added).

**4.** As set forth in the Charter Regulations:

> *Charter Service* means transportation using buses or vans, or facilities funded under the Acts of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge (in accordance with the carrier's tariff) for the vehicle or service, have acquired the exclusive use of the vehicle or service to travel together under an itinerary either specified in advance or modified after having left the place of origin. This definition includes the incidental use of FTA funded equipment for the exclusive transportation of school students, personnel, and equipment.

49 C.F.R. § 604.5(e).

lar game. As the Regional Administrator observed:

> Complainants' argument that all of the individual passengers somehow transform into a single group, that their fares when combined become a single contract for a fixed charge, and the fact that the passengers know where the bus is going when they board it, means it is charter, is unpersuasive.

A.R. 37. The FTA concluded that the shuttle service was not "charter service" because "there was no single contract with a fixed charge, no exclusive use, nor an itinerary controlled by other than the transit operator." A.R. 36. This decision was consistent with a previous determination that "[s]ervice to regularly scheduled but relatively infrequent events (sporting events, annual festivals) that is open door, with the routes and schedules set by the grantee and with fares collected from individuals, whether or not the individual fares are subsidized by a donor" was not charter service. Question 27(d) of the FTA's "Charter Service Questions and Answers," 52 *Fed.Reg.* 42248, 42252 (Nov. 3, 1987).

Second, the shuttle service benefits the public at large and not "some special organization such as a private club." 52 *Fed. Reg.* 11916, 11920. Granted that sports fans are not the general public but a "subset of the general public," A.R. 37, "the service is designed so that anyone can board the bus, no reservations are required and, according to the brochure, fares are paid as you board." A.R. 37. There is no evidence in the record that the shuttle service customers formed "a well-defined and cohesive enough group to be considered a 'special organization.'" A.R. 37 (quoting *Washington Motor Coach Assoc. v. Municipality of Metropolitan Seattle,* WA–09/87–01 (Mar. 21, 1988)). The FTA, in an effort to ensure that the shuttle service "allows any member of the public an equal opportunity to use the service," A.R. 37 (Reg. Administrator's Decision at 6), indeed ordered the RGRTA to correct its brochures and schedules so that "a fixed time is given for pick up at the game site and that Respondent adhere to this schedule."

Third, FTA determined that the shuttle service is "open door, widely advertised and available to the public." A.R. 38. There is no dispute that the RGRTA "advertised the service on inside and outside bus cards and on radio and television." A.R. 38. *See* A.R. 43, 48–49.

The FTA's determination that the RGRTA shuttle service satisfies its three-factor test that it is "mass transportation," and that it is not subject to the Charter Regulations, was not "arbitrary" or "capricious."

This conclusion is not undermined by the plaintiffs' argument that the shuttle service constituted "intercity bus service." Pl.'s Mot.Summ.J. at 15, 27. The FTA defines "intercity bus service" as "regularly scheduled bus service for the general public which operates with limited stops over fixed routes connecting two or more urban areas not in close proximity, which has the capacity for transporting baggage carried by passengers, and which makes meaningful connections with scheduled bus service to more distant points. . . ." A.R. 1 (Administrator's Decision at 1) (citing *Non-urbanized Area Formula Program Guidance,* Ch. VII, ¶ 6). The Administrator rationally noted that the shuttle service does not meet this definition because it is "designed to carry attendees to sporting events and not to transport baggage-carrying passengers to connections with long-distance bus service." A.R. 1. Nor is the shuttle service not "mass transportation" simply because it covers a considerable distance and has limited stops: FTA has funded public bus service between Atlantic City and New York City (approximately 100 miles); between New York City and Cape May, New Jersey (approximately 100 miles); and between Cape May and Philadelphia, Pennsylvania (approximately 80 miles). A.R. 1–2.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, it is hereby

**ORDERED** that the defendant's motion for summary judgment [# 30] is **granted,** and it is

**FURTHER ORDERED** that the plaintiff's case is **dismissed with prejudice.**