# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2008       Decided February 24, 2009

No. 06-1410

AMERICAN FARM BUREAU FEDERATION AND NATIONAL PORK
PRODUCERS COUNCIL,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN CHEMISTRY COUNCIL, ET AL.,
INTERVENORS

———

Consolidated with 06-1411, 06-1415, 06-1416, 06-1417

———

On Petitions for Review of an Order
of the Environmental Protection Agency

———

*Michael J. Myers*, Assistant Attorney General, Attorney
General's Office of State of New York, argued the cause for
State Petitioners and State Amici.  With him on the briefs were
*Andrew M. Cuomo*, Attorney General, *Barbara D. Underwood*,
Solicitor General, and *Katherine Kennedy*, Assistant Attorney
General, *Terry Goddard*, Attorney General, Attorney General's
Office of the State of Arizona, *Joseph P. Mikitish*, Assistant

Attorney General, *Edmund G. Brown, Jr.*, Attorney General, Attorney General's Office of the State of California, *Theodora Berger*, Senior Assistant Attorney General, *Susan L. Durbin*, Deputy Attorney General, *Richard Blumenthal*, Attorney General, Attorney General's Office of the State of Connecticut, *Kimberly Massicotte*, Assistant Attorney General, *Joseph R. Biden, III*, Attorney General, Attorney General's Office of the State of Delaware, *Valerie S. Csizmadia*, Deputy Attorney General, *Lisa Madigan*, Attorney General, Attorney General's Office of the State of Illinois, *Thomas Davis*, Assistant Attorney General, *G. Steven Rowe*, Attorney General, Attorney General's Office of the State of Maine, *Gerald D. Reid*, Assistant Attorney General, *Douglas F. Gansler*, Attorney General, Attorney General's Office of the State of Maryland, *Kathy M. Kinsey*, *Roberta R. James*, and *Mary Raivel*, Assistant Attorneys General, *Martha Coakley*, Attorney General, Attorney General's Office for the Commonwealth of Massachusetts, *William L. Pardee*, Assistant Attorney General, *Kelly A. Ayotte*, Attorney General, Attorney General's Office of the State of New Hampshire, *Maureen D. Smith*, Senior Assistant Attorney General, *Ann Milgram*, Attorney General, Attorney General's Office of the State of New Jersey, *Kevin P. Auerbacher* and *Jung Kim*, Deputy Attorneys General, *Gary King*, Attorney General, Attorney General's Office of the State of New Mexico, *Stephen R. Farris*, Assistant Attorney General, *Tracy M. Hughes*, *William G. Grantham*, and *Karen L. Reed*, Special Assistant Attorneys General, *Hardy Myers*, Attorney General, Attorney General's Office of the State of Oregon, *Philip Schradle*, Special Counsel, *Kristen M. Campfield*, Associate Counsel, The Commonwealth of Pennsylvania, Department of Environmental Protection, *Patrick C. Lynch*, Attorney General, Attorney General's Office of the State of Rhode Island, *Tricia K. Jedele*, Special Assistant Attorney General, *William H. Sorrell*, Attorney General, Attorney General's Office of State of Vermont, *Kevin O. Leske*, Assistant Attorney General, *Peter J.*

*Nickles,* Interim Attorney General, Attorney General's Office of the District of Columbia, *Todd S. Kim,* Solicitor General, *Donna M. Murasky,* Senior Assistant Attorney General, *Kurt R. Wiese,* District Counsel, South Coast Air Quality Management District, and *Barbara Baird,* Principal Deputy District Counsel. *J. Jared Snyder,* Assistant Attorney General, Attorney General's Office of State of New York, and *Kristen C. Furlan,* Attorney, The Commonwealth of Pennsylvania, Department of Environmental Protection, entered appearances.

*Paul R. Cort* argued the cause for Environmental Petitioners. With him on the briefs were *Erin M. Tobin, Deborah S. Reames,* and *David S. Baron.*

*Denise W. Kennedy* and *Richard E. Schwartz* argued the cause for Industry Petitioners. With them on the briefs were *Kirsten L. Nathanson, Lawrence E. Volmert, Robert T. Connery, John F. Shepherd, Gary H. Baise,* and *Julie Anna Potts. John J. Zimmerman* entered an appearance.

*Hope M. Babcock* was on the joint brief for Health Amici.

*Norman L. Rave, Jr.,* and *Brian H. Lynk,* Attorneys, U.S. Department of Justice, argued the cause for respondent. With them on the brief were *John C. Cruden,* Deputy Assistant Attorney General, and *Steven E. Silverman* and *John T. Hannon,* Attorneys, U.S. Environmental Protection Agency.

*F. William Brownell, Allison D. Wood, Lucinda Minton Langworthy, Leslie A. Hulse, Stacy R. Linden, Richard S. Wasserstrom, Robin S. Conrad,* and *Amar D. Sarwal* were on the joint brief of Fine PM Industry Intervenors in support of respondent.

*Richard E. Schwartz, Kirsten L. Nathanson, Peter S.*

*Glaser, Robert R. Gasaway, Ashley C. Parrish, Julie Anna Potts,* and *Harold P. Quinn, Jr.*, were on the joint Coarse PM NAAQS brief for industry intervenors in support of respondent.

*Erin Tobin*, *Paul Cort*, *Deborah S. Reames*, and *David S. Baron* were on the brief for intervenors American Lung Association and Environmental Defense.

*Thomas J. Ward*, *Robert R. Gasaway*, and *Ashley C. Parrish* were on the brief of amicus curiae National Association of Home Builders in support of respondent. *Duane J. Desiderio* entered an appearance.

Before: GINSBURG, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: In these consolidated cases, we consider several challenges to the Environmental Protection Agency's most recent revision of the National Ambient Air Quality Standards for particulate matter. Because the agency promulgated standards for fine particulate matter that were, in several respects, contrary to law and unsupported by adequately reasoned decisionmaking, we grant the petitions for review in part and remand those standards to the agency for further proceedings. We deny the petitions for review of the agency's standards for coarse particulate matter because those standards are not arbitrary, capricious, or otherwise contrary to law.

5

I.

A. Background to the 2006 Rulemaking

*Particulate Matter Pollution*

This case is about the Environmental Protection Agency's (EPA) regulation of particulate matter (PM), an air pollutant. PM includes "a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes." Final Rule: National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,143, 61,146 (2006). Within this general definition, PM is classified based on factors such as particle size, origin, and chemical composition. The EPA primarily uses particle size to classify PM, distinguishing between "fine PM" and "coarse PM."

Fine and coarse PM differ in ways other than size. Fine PM is produced chiefly by combustion processes and atmospheric reactions of gaseous pollutants; sources include motor vehicles, power generation, and residential fuel burning. Coarse PM tends to result from mechanical processes or the resuspension of dusts in the air; sources include construction and demolition activities as well as agricultural and mining operations. The two types of PM also exhibit different atmospheric behavior: while fine PM can remain suspended for long periods of time and travel great distances, coarse PM tends to deposit rapidly and does not travel as far.

The EPA further notes that "it is appropriate to draw a distinction between two general types of ambient mixes of coarse particles: 'urban' and 'non-urban.'" *Id.* at 61,185 n.66. "Urban" coarse "characterizes the mix in more heavily populated urban areas, where sources such as motor vehicles and

industry contribute heavily to ambient coarse particle concentrations and composition." *Id.* In contrast, "non-urban" coarse "encompasses mixes in a variety of other locations outside of urbanized areas, including mixes in rural areas which are likely to be dominated by natural crustal materials." *Id.* The EPA cautions, however, that this is not a sharp distinction because "some types of sources are present in both urban and non-urban areas." *Id.*

Studies have demonstrated that both fine and coarse PM can have negative effects on public health and welfare. For example, each is associated with increased mortality (premature death) rates and morbidity (illness) effects such as cardiovascular disease and decreased lung function. Specifically, scientific evidence supports these associations for long- and short-term exposure to fine PM as well as short-term exposure to urban coarse PM. With regard to public welfare, high levels of fine PM in the air can impair visibility, while both fine and coarse PM can damage vegetation, disrupt ecosystems, corrode metals, and erode paints and other building materials.

*The Clean Air Act*

The Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671p (2000), a comprehensive statutory scheme designed to reduce air pollution, requires the EPA to set national ambient air quality standards (NAAQS) for air pollutants such as PM. The statute directs the agency to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare." *Id.* § 7408(a)(1). Once a pollutant is identified, the agency staff develop and issue air quality criteria, collected in a Criteria Document, that "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air."

*Id.* § 7408(a)(2). Although not required by the statute, in practice EPA staff also develop a Staff Paper, which discusses the information in the Criteria Document that is most relevant to the policy judgments the EPA makes when it sets the NAAQS.

For each pollutant identified, the EPA must propose and promulgate two sets of NAAQS: (1) primary NAAQS, "the attainment and maintenance of which in the judgment of the Administrator, based on [the air quality criteria] and allowing an adequate margin of safety, are requisite to protect the *public health*," *id.* § 7409(b)(1) (emphasis added); and (2) secondary NAAQS specifying a level of air quality "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the *public welfare* from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air," *id.* § 7409(b)(2) (emphasis added). In setting both standards, the EPA takes into account the Criteria Document, the Staff Paper, and the recommendations of the Clean Air Scientific Advisory Committee (CASAC), a seven-member, independent scientific review committee appointed by the Administrator pursuant to 42 U.S.C. § 7409(d)(2). The EPA must review the air quality criteria and the NAAQS and revise them as necessary at least once every five years. *Id.* § 7409(d)(1).

Each NAAQS has four components: the indicator, the level, the averaging time, and the form. The "indicator" defines the parameters of the substance that the EPA will measure — for example, the size or composition of the particles to which a PM standard will apply. The "level" specifies the acceptable concentration of that indicator in the air. The "averaging time" specifies the span of time across which the amount of a pollutant in the air will be averaged. For example, some NAAQS require a certain average *annual* level, while others require a certain average *daily* level. The "form" of a NAAQS describes how

compliance with the level will be determined within this averaging time. A NAAQS with a daily averaging time, for example, might require that the level not be exceeded on more than one day each year.

*Previous PM Rulemakings*

In 1971, the EPA identified PM as an air pollutant under the CAA and promulgated the first set of PM NAAQS. It selected as the indicator "total suspended particulate" (TSP), which is measured using a device that collects from an air sample all PM up to a diameter of 25 to 45 μm (micrometers). The EPA first revised the PM NAAQS in 1987. It changed the indicator from TSP to $PM_{10}$, which includes all particles with a diameter less than or equal to 10 μm. The EPA also changed both the level and the form of the primary annual standard, setting the new standard at 50 $\mu g/m^3$ (micrograms per cubic meter) measured as an expected annual arithmetic (rather than geometric) mean. It also changed the level of the 24-hour standard from 260 to 150 $\mu g/m^3$, but retained the form of one exceedance per year. Finally, the EPA revised the secondary standards to be identical to the new primary standards.

The next revision took place in 1997 and allowed separate regulation of fine and coarse PM for the first time. The EPA added a second PM indicator, $PM_{2.5}$, which includes all particles with a diameter less than or equal to 2.5 μm. It set the primary and secondary NAAQS for fine PM at a level of 15 $\mu g/m^3$ based on a three-year average of annual arithmetic mean concentrations, and a level of 65 $\mu g/m^3$ based on a three-year average of the 98th percentile of daily concentrations. For coarse PM, the EPA revised the form of the primary and secondary 24-hour $PM_{10}$ standards to be based on the 99th percentile of concentrations at each monitoring site within a geographic area.

Several parties filed petitions for review in this court challenging the 1997 revision to the NAAQS for PM and ozone. In May 1999, we upheld the EPA's decision to regulate fine PM separately from coarse PM. *See Am. Trucking Ass'ns, Inc. v. EPA* (*ATA I*), 175 F.3d 1027, 1055–56 (D.C. Cir. 1999). We held, however, that the selection of $PM_{10}$ as the indicator for coarse PM was arbitrary and capricious. Because a $PM_{10}$ indicator includes particles that are also part of a $PM_{2.5}$ indicator, the $PM_{10}$ indicator was "inherently confounded," and the EPA had not explained how the two standards would work together rather than lead to overregulation of the fine fraction of $PM_{10}$ and underregulation of the coarse fraction. *Id.* at 1054. We also held that the EPA's interpretation of the CAA's requirement to set NAAQS at the "requisite" protective level lacked an intelligible principle to guide the agency's decisionmaking and therefore "effect[ed] an unconstitutional delegation of legislative power." *Id.* at 1033–34. We subsequently granted rehearing in part to revise a section of the original opinion dealing with the NAAQS for ozone, but made no change to our conclusions about PM. *See Am. Trucking Ass'ns, Inc. v. EPA* (*ATA II*), 195 F.3d 4, 10 (D.C. Cir. 1999).

In February 2001, the Supreme Court reversed our holding as to unconstitutional delegation and resolved certain other issues not relevant to this case. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001). On remand, we considered the remaining challenges to the NAAQS not resolved by *ATA I* and *II* or *Whitman*. We rejected each of the challenges to the new $PM_{2.5}$ NAAQS. *See Am. Trucking Ass'ns, Inc. v. EPA* (*ATA III*), 283 F.3d 355, 358 (D.C. Cir. 2002). At the conclusion of the litigation, therefore, the EPA's new $PM_{2.5}$ NAAQS remained intact and its revised $PM_{10}$ NAAQS were rescinded; the preexisting 1987 $PM_{10}$ NAAQS remained in place.

## B. 2006 Rulemaking

The EPA began the review process that resulted in the revisions challenged here in October 1997, shortly after the 1997 NAAQS were promulgated. In 2003, several environmental groups brought a lawsuit challenging the EPA's failure to complete its review within five years as required by the CAA. Pursuant to a consent decree entered in that lawsuit, the EPA published its proposed revisions to the PM NAAQS on January 17, 2006. The EPA proposed several changes to the existing suite of PM standards: (1) reducing the level of the primary daily fine PM standard from 65 to 35 $\mu g/m^3$; (2) changing the indicator for coarse PM to $PM_{10-2.5}$, in order to measure only particles with a diameter between 2.5 and 10 $\mu m$; (3) qualifying the coarse PM indicator to include ambient mixes of PM "dominated by" the type of particles found in urban areas while excluding ambient mixes "dominated by" particles typical of rural areas; (4) revoking the annual coarse PM standards; (5) reducing the level of the primary daily coarse PM standard from 150 to 70 $\mu g/m^3$ and changing the form to measure compliance based on the 98th percentile of annual daily concentrations averaged over three years; and (6) adjusting all secondary standards to be identical to the revised primary standards.

The CASAC, along with medical and public health groups who submitted comments, challenged the EPA's proposal to retain the existing level of the primary annual fine PM standard at 15 $\mu g/m^3$. They urged the EPA to lower the level to somewhere between 12 and 14 $\mu g/m^3$. The CASAC and several public commenters also objected to setting the secondary standards for fine PM at the same level and averaging time as the primary standards, arguing that they were insufficient to protect against adverse visibility effects. The CASAC supported

the EPA's revocation of the annual standard for coarse PM; some commenters, however, objected.

While commentary on most of the proposals was split, the EPA's proposed qualification of the coarse PM indicator drew an almost entirely negative response. Commenters challenged the agency's interpretation of the scientific evidence and its conclusion that nonurban coarse PM is not associated with adverse effects on public health. The EPA's proposed approach for distinguishing between urban and nonurban coarse PM came in for criticism as well. Commenters argued that the EPA had not adequately defined which substances were subject to regulation, but had instead adopted an indicator defined arbitrarily by the requirements for placing coarse PM monitors in particular geographic areas.

The EPA issued its final rule on October 17, 2006. Although it made no changes to its proposed fine PM standards, the EPA reversed its position on the qualified coarse PM indicator and retained an unqualified indicator. The EPA selected $PM_{10}$ rather than $PM_{10-2.5}$ in an attempt to differentiate indirectly between urban and rural coarse PM. As discussed above, $PM_{10}$ includes all particles with a diameter less than or equal to 10 μm — including fine PM particles with a diameter up to 2.5 μm. Because urban areas tend to have higher levels of fine PM than rural areas, a coarse PM limit based on $PM_{10}$ would effectively require urban areas to have lower levels of true coarse PM — that is, particles between 2.5 and 10 μm in diameter — than rural areas. The EPA thus believes the standard will target protection toward urban areas, where it is most needed. Finally, based on the recommendation by the EPA staff and the CASAC that the existing level of protection from coarse PM was appropriate, and on its decision to retain the existing $PM_{10}$ indicator, the EPA concluded that no change to the level of the 24-hour coarse PM standard was necessary.

## C.  Petitions for Review

Three sets of petitioners, joined by several intervenors and amici, filed petitions for review of the EPA's final rule.  The American Lung Association, Environmental Defense, and the National Parks Conservation Association (environmental petitioners) challenge the primary annual and secondary standards for fine PM as well as the elimination of the annual standard for coarse PM.  Several states and state agencies (state petitioners) challenge the primary annual fine PM standard.  The American Farm Bureau Federation, the National Pork Producers Council, the National Cattlemen's Beef Association, and the Agricultural Retailers Association (industry petitioners) challenge the EPA's retention of the $PM_{10}$ indicator for coarse PM and the 150 μg/m$^3$ level for the daily coarse PM standard.

We review the actions of the EPA to determine whether they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations."  42 U.S.C. § 7607(d)(9).  Although we perform a "searching and careful" inquiry into the facts underlying the agency's decisions, we will "presume the validity of agency action as long as 'a rational basis for it is presented.'"  *ATA III*, 283 F.3d at 362 (quoting *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1145 (D.C. Cir. 1980)).  We give an "extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise," reviewing the agency's action to "ensure that the EPA has examined the relevant data and has articulated an adequate explanation for its action." *City of Waukesha v. EPA*, 320 F.3d 228, 248 (D.C. Cir. 2003) (internal quotation marks omitted).  And with regard to the EPA's interpretation of the CAA — a statute that the agency administers — we follow the

rule announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). We first consider whether the Congress has directly addressed the question at issue. If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute is silent or ambiguous on the issue, we ask "whether the agency's answer is based on a permissible construction of the statute." *Id.*

In Part II we grant in part the petitions for review of the primary annual fine PM standard, brought by the states and environmental groups, and remand the standard to the EPA for reconsideration. The EPA failed to explain adequately why an annual level of 15 μg/m³ is "requisite to protect the public health," including the health of vulnerable subpopulations, while providing "an adequate margin of safety." 42 U.S.C. § 7409(b)(1).

In Part III we grant in full the petition for review of the secondary NAAQS for fine PM brought by the environmental groups and remand them to the EPA for reconsideration. The EPA unreasonably concluded that the NAAQS are adequate to protect the public welfare from adverse effects on visibility.

In Part IV we deny the petitions for review of the primary daily standards for coarse PM brought by the industry groups. We do not reach the question raised by the amicus National Association of Home Builders whether the EPA lawfully could have distinguished between urban and nonurban coarse PM in selecting the coarse PM indicator.

Finally, in Part V, we deny the petition for review of the EPA's revocation of the primary annual standard for coarse PM brought by the environmental groups.

14

II.

The state and environmental petitioners claim the EPA's decision to set the primary annual NAAQS for $PM_{2.5}$ at 15 µg/m³ pursuant to its authority under § 109(b)(1) of the CAA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9). In assessing their arguments, we defer to the EPA's scientific judgment while examining the record to ensure the agency has considered the relevant factors and reasonably explained how it reached its conclusions. *See Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005) (under Administrative Procedure Act, court defers to agency's technical expertise but asks whether it "has 'examined relevant data and has articulated a rational explanation for its actions'"); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) (substantive review under CAA mirrors that under APA).

We conclude the EPA failed adequately to explain why, in view of the risks posed by short-term exposures and the evidence of morbidity resulting from long-term exposures, its annual standard is sufficient "to protect the public health [with] an adequate margin of safety," 42 U.S.C. § 7409(b)(1). Accordingly, we grant the petitions for review in part and remand the annual NAAQS to the EPA for reconsideration.

A. Risk of Short-Term Exposure

An agency's failure adequately to consider a relevant and significant aspect of a problem may render its rulemaking arbitrary and capricious. *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("agency must examine the relevant data and articulate a satisfactory explanation for its action"). In setting

the primary annual NAAQS for PM$_{2.5}$, the EPA relied exclusively upon studies of long-term exposure, placing the greatest weight upon the Harvard Six Cities and the American Cancer Society (ACS) studies. *See* 2006 Final Rule, 71 Fed. Reg. at 61,176/2. The state and environmental petitioners argue the EPA did not adequately explain why, even if the studies of long-term exposure were "most directly relevant" to setting the annual standard, *id.* at 61,174/3, the studies of short-term exposure were not at all relevant.

In the EPA's view, studies of long-term exposure are most directly relevant to the annual standard because the human body responds differently to long-term than to short-term exposure and because a long-term study evaluates "periods of exposure" closer to a year than the periods evaluated in a short-term study. *See id.*; Proposed Rule: National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 2620, 2627/2–3 (2006); U.S. ENVTL. PROT. AGENCY, AIR QUALITY CRITERIA FOR PARTICULATE MATTER (CRITERIA DOCUMENT) § 8.2.1, at 8-18 (2004). Be that as it may, the EPA did not assert that short-term studies provide no relevant information. The EPA concluded merely that it would be "more appropriate to consider the short-term exposure studies as a basis for . . . the 24-hour standard and to consider the long-term exposure studies as a basis for the . . . annual standard." 2006 Final Rule, 71 Fed. Reg. at 61,174/2.

Two premises underlie this conclusion: the agency can (1) "appropriately . . . evaluate[]" where to set the level of the annual standard based solely upon the long-term studies and (2) "provide an appropriate degree of protection" from short-term exposure through a daily standard alone. *Id.* at 61,174/3. The petitioners challenge both.

As to the first, the petitioners start by pointing out that the staff and the CASAC, both of which relied upon three short-

term studies, proposed an annual standard lower than 15 µg/m³. *See* OFFICE OF AIR QUALITY PLANNING AND STANDARDS, U.S. ENVTL. PROT. AGENCY, REVIEW OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER: POLICY ASSESSMENT OF SCIENTIFIC AND TECHNICAL INFORMATION (STAFF PAPER) § 5.3.1.1, at 5-7 (2005); Letter from Dr. Rogene Henderson, CASAC, to Administrator Stephen L. Johnson, EPA 3–4 (Mar. 21, 2006) ("Studies described in the PM Staff Paper indicate that short term effects of $PM_{2.5}$ persist in cities with annual $PM_{2.5}$ concentrations below [15 µg/m³]"). By statute the EPA must explain its rejection of the CASAC's recommendation, 42 U.S.C. § 7607(d)(3), and the staff's analysis is something we consider when determining whether the EPA has adequately addressed the relevant considerations and reasonably reached its conclusions, *see Natural Res. Def. Council v. EPA*, 902 F.2d 962, 967–68, 970 (D.C. Cir. 1990) (noting staff paper's relevance as "bridge" over "gap" between criteria document and EPA's policy judgment).[*]

We reject the EPA's initial response, to wit, that its approach is consistent with those recommendations. *See* 2006 Final Rule, 71 Fed. Reg. at 61,174/3 n.45. The CASAC directly challenged the EPA's proposal to retain the annual standard at 15 µg/m³. *See* Letter from Dr. Rogene Henderson, CASAC, to Administrator Stephen L. Johnson, EPA 7 (June 6, 2005). The staff recommended that if the agency kept the annual standard at 15 µg/m³ while setting the daily standard with a 98th percentile form, then it should set the daily standard at the "middle to lower end" of the range from 25 to 35 µg/m³. *See*

---

[*] We will not consider the letter the CASAC sent to the EPA on September 29, 2006, shortly after the Administrator had signed the final rule, as it was not part of the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (generally judicial review is limited to "record that was before the [agency] at the time [it] made [its] decision").

STAFF PAPER § 5.3.7, at 5-46; *see also id.* § 5.3.5.1, at 5-32 ("[S]taff continues to believe that an annual standard cannot be expected to offer an adequate margin of safety against the effects of all short-term exposures"). The EPA instead set the daily standard at 35 $\mu$g/m$^3$ with a 98th percentile form, *see* 2006 Final Rule, 71 Fed. Reg. at 61,165/2; *id.* at 61,171/3, while acknowledging it did not consider the short-term studies when setting the annual standard. As both the CASAC and the staff reasoned, the studies of Eight Canadian Cities, of Santa Clara County (CA), and of Phoenix are relevant to setting an annual standard because each reports adverse health effects associated with short-term exposures in places where the annual PM$_{2.5}$ concentration is below 15 $\mu$g/m$^3$. *See* CASAC Mar. 21 Letter at 3–4. The EPA failed adequately to explain its reason for not accepting the CASAC's recommendations, instead stating only that it did not "disagree with CASAC's factual statements regarding the findings of [the short-term studies]," but "believes . . . it . . . more appropriate to consider the short-term exposure studies as a basis for the level of the 24-hour standard." 2006 Final Rule, 71 Fed. Reg. at 61,174/2.

The petitioners also point to the EPA's unexplained change of position since it last dealt with this issue, which was in 1997. Then the EPA believed short-term studies were indeed relevant to the setting of an annual standard, stating, "the strongest evidence for short-term PM$_{2.5}$ effects occurs at concentrations near the long-term (e.g., annual) average." *See* Final Rule: National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,676/1 (1997). The agency did not thereby commit itself irrevocably, however if the relevant facts have changed or the EPA has reasonably made a different policy judgment, then it need only explain itself and we will defer. *See* *State Farm*, 463 U.S. at 57 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances" (internal quotation marks omitted)).

The EPA's only explanation for its change of position is that it relied upon short-term studies in 1997 because the studies of long-term exposure then available were less reliable than the short-term studies. *See* 2006 Final Rule, 71 Fed. Reg. at 61,174/3. At the time, however, the agency also said, "an annual standard that controls an area's attainment status is likely to reduce aggregate risks associated with both short- and long-term exposures with more certainty than a 24-hour standard." 1997 Final Rule, 62 Fed. Reg. at 38,670/3. Even if the long-term studies available today are useful for setting an annual standard, therefore, it is not clear why the EPA no longer believes it useful to look as well to short-term studies in order to design the suite of standards that will most effectively reduce the risks associated with short-term exposure.

We conclude the EPA failed adequately to explain its first premise, *viz.* that an annual standard could be "appropriately . . . evaluated based" solely upon long-term studies. *See* 2006 Final Rule, 71 Fed. Reg. at 61,174/3. Therefore, we need not reach the state petitioners' argument that the EPA should have relied in part upon the short-term studies because, unlike the ACS Study, those studies do not underestimate the magnitude of risk from exposure to $PM_{2.5}$. That argument does not rest upon the ACS Study having examined long-term rather than short-term exposure, but instead questions whether the ACS Study involved a representative cohort. If, however, the EPA can adequately explain why studies of short-term effects are not relevant to setting an annual standard, then it may disregard those studies regardless whether the short-term studies are based upon a more representative cohort than is the ACS Study.

Nor do we consider the EPA's argument that the short-term studies showed an annual standard would not provide more protection against short-term exposure than would a daily

standard. That argument was advanced for the first time in its brief and therefore is not properly before us. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court . . . must judge . . . [administrative] action solely by the grounds invoked by the agency" when it acted); *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 981 & n.6 (D.C. Cir. 1976) (court cannot rely upon *post hoc* position unless "no special agency expertise is involved").

The petitioners also challenge the EPA's second premise, that a primary daily standard for $PM_{2.5}$ at 35 $\mu g/m^3$ with a 98th percentile form could "provide an appropriate degree of protection" from short-term exposure, thus eliminating the need to calibrate the annual standard to address short-term exposure. 2006 Final Rule, 71 Fed. Reg. at 61,174/3; *see id.* at 61,165/2 (selecting percentile form of standard); *id.* at 61,171/3 (selecting level of standard). The EPA's daily standard will require each state to make sure that the average of the seventh highest concentration measured each year for three years does not exceed 35 $\mu g/m^3$, thus permitting approximately six days a year to have concentrations above that level. *See id.* at 61,164–65 (describing form of standard). The petitioners argue the EPA's reliance upon the daily standard to address all the health risks from short-term exposure was unreasonable for several reasons.

First, the environmental petitioners contend the record shows that low- to mid-range concentrations of $PM_{2.5}$ cause most health effects from short-term exposure, noting that both the staff and the CASAC warned of risks at ambient concentrations below 35 $\mu g/m^3$. *See* STAFF PAPER § 5.3.5.1, at 5-31–32; CASAC June 6 Letter at 7. In particular, the CASAC observed that, because some cities have "relatively high annual PM concentrations" but would "rarely" exceed ambient concentrations of 35 $\mu g/m^3$, it would be necessary to lower the annual standard below 15 $\mu g/m^3$ to provide sufficient protection

from the risks associated with short-term exposure. CASAC June 6 Letter at 7. The EPA maintains lowering the daily standard to 35 μg/m³ will provide additional protection in all areas where it is required, but as we discuss below, it is not clear why the EPA believes areas that already meet the daily standard either do not require additional protection or will enjoy improved protection against short-term exposure.

Second, the environmental petitioners question the EPA's methodology. The EPA focused upon the 98th percentile air quality values in the short-term studies, concluding those values would shed light upon which overall distributions of air quality likely cause harm from short-term exposure. Because some studies did not find a statistically significant association between short-term exposure and health effects when the 98th percentile values were below 35 μg/m³, the EPA selected 35 μg/m³ as the level, and the 98th percentile as the form, of the primary daily standard. 2006 Final Rule, 71 Fed. Reg. at 61,169. The EPA does not contend, however, that lowering the peak concentrations to 35 μg/m³ would provide sufficient protection. Indeed, the EPA acknowledges that to provide adequate protection against short-term exposure, it must lower "a broad distribution of $PM_{2.5}$ air quality values in an area," but explains that lowering the daily standard will lower concentrations not only at the peak of the distribution curve, but also those at the trough because state implementation plans, "[a]lthough . . . not yet defined, . . . are likely to" require the necessary improvements in air quality. *Id.* at 61,168/3.

In support of this prediction the EPA points to a study finding that as peak daily levels of $PM_{2.5}$ decreased from "one year to the next" in Philadelphia and Los Angeles, all off-peak air quality values, or "low daily $PM_{2.5}$ levels[,] decreased proportionally." *See* ABT ASSOCS., INC., PARTICULATE MATTER HEALTH RISK ASSESSMENT FOR SELECTED URBAN AREAS (RISK

ASSESSMENT) 17 (2005); *see also* STAFF PAPER § 4.3.1.2, at 4-18 (study showed "concentrations at different points in the distribution of 24-hour $PM_{2.5}$ values . . . decreased by approximately the same percentage"). Although the EPA is entitled to rely upon its experience, it must have a reasonable explanation of how its experience supports its conclusion. *See DSE, Inc. v. United States*, 169 F.3d 21, 30 (D.C. Cir. 1999) (court "will defer to [agency's] experience provided that the agency has offered a reasoned explanation . . . [and] the result is in accord with material facts . . . in the administrative record"). The environmental petitioners rightly question the EPA's conclusion based upon past trends in Philadelphia and Los Angeles; according to the same study, they point out, the proportional decline in peak and off-peak daily levels of $PM_{2.5}$ in those cities was "not . . . the result of a $PM_{2.5}$ control strategy, but likely result[ed] from control programs for $PM_{10}$ and control programs for other pollutants." RISK ASSESSMENT at 17. The EPA offers no basis in the experience of those two cities — thus understood — for expecting controls on the peak levels of fine particles will lead to a proportional decline in levels of $PM_{2.5}$ at off-peak times simply because controls for coarse particles and for other pollutants did so in the past. The EPA may not and perhaps need not fully understand why off-peak $PM_{2.5}$ levels decreased as peak $PM_{2.5}$ levels decreased in the past, but it nevertheless needs plausibly to explain why it believes future controls for $PM_{2.5}$ will, like other controls for other pollutants in the past, trigger the phenomenon.

Even assuming off-peak levels of $PM_{2.5}$ will decrease in proportion to decreases at peak levels, the environmental petitioners argue there will be no such decline in areas that already comply with the daily standard and therefore will not have to reduce ambient daily concentrations. It is not enough for the EPA to respond that, as it implied during the rulemaking, those areas do not need further improvement; the agency itself

observed that short-term health effects occur across a "broad distribution of $PM_{2.5}$ air quality values." *See* 2006 Final Rule, 71 Fed. Reg. at 61,168/3.

We conclude the EPA has failed reasonably to explain why it believes its daily standard will "provide an appropriate degree of protection from health effects associated with short-term exposures to $PM_{2.5}$." *Id.* at 61,174/3. We therefore remand the annual standard to the EPA for further consideration of whether it is set at a level requisite to protect the public health while providing an adequate margin of safety from the risk of short-term exposure to $PM_{2.5}$.

B. Morbidity Among Vulnerable Subpopulations

The state petitioners believe the EPA unreasonably concluded morbidity studies did not provide a basis for setting a primary annual standard for $PM_{2.5}$ below 15 μg/m$^3$. First, they argue the EPA arbitrarily refused to rely upon a study finding an association between irreversible lung damage in children and long-term exposure to $PM_{2.5}$ at levels below 15 μg/m$^3$. *See* W. James Gauderman et al., *Association Between Air Pollution and Lung Function Growth in Southern California Children*, 162 AM. J. RESPIRATORY & CRITICAL CARE MED. 1383 (2000). The staff thought the Gauderman Study, if given "appreciable weight," indicated an annual standard of 13 μg/m$^3$. *See* STAFF PAPER § 5.3.4.1, at 5-22–23. Although the CASAC did not advert to the Gauderman Study, it recommended a level of 13 to 14 μg/m$^3$ based upon the risk assessment and the short-term studies. *See* CASAC Mar. 21 Letter at 1. The EPA acknowledged the Gauderman Study presented "important new findings" but decided not to rely upon it because it was the only study measuring "decreased growth in lung function" over time and it focused solely upon children in one location. 2006 Final Rule, 71 Fed. Reg. at 61,172/2-3.

The state petitioners complain that the EPA's rejection of the Gauderman Study was based upon the faulty premise that "further study . . . would be needed to increase confidence in the reported associations" because no other study in the record was consistent with the results of the Gauderman Study. *Id.* at 61,172/3. According to the state petitioners, the findings of the Gauderman Study are supported by Mark Raizenne et al., *Health Effects of Acid Aerosols on North American Children: Pulmonary Function*, 104 ENVTL. HEALTH PERSP. 506 (1996) (24-Cities Study). The EPA disagreed: the 24-Cities Study measured decreased lung function "at a single point in time" while the Gauderman Study found "decreased growth in lung function" over time. 2006 Final Rule, 71 Fed. Reg. at 61,172/3.

We believe the EPA's approach to the Gauderman and 24-Cities studies was unreasonable in light of the agency's obligation to explain how the annual standard it set would protect "not only average healthy individuals, but also 'sensitive citizens.'" *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998). As the American Lung Association argued during the rulemaking — and the EPA agreed — with each breath a child aspirates more pollution relative to its body weight than does an adult. *See* American Lung Association (ALA) et al., Comments, 2006 Rulemaking, Pub. Dkt. No. OAR-2001-0017-1890.1, at 17 (filed Apr. 17, 2006); 2006 Proposed Rule, 71 Fed. Reg. at 2637/1 ("Several factors may make children susceptible to PM-related effects, including the greater ventilation rate per kilogram body weight in children"). We therefore doubt whether the studies of adult mortality upon which the EPA relied provide the necessary confidence concerning the risk of morbidity in children.

We doubt the reasonableness of the EPA's analysis for a second reason: the agency imputed undue significance to one

difference, despite many similarities, between the Gauderman Study, which focused upon the growth over time of lung function in children, and the 24-Cities Study, which focused upon the level of lung function of children at a particular time. Both studies found an association between exposure to $PM_{2.5}$ at levels below 15 $\mu g/m^3$ and impairment of lung function in children, although the association in the 24-Cities Study was "not statistically significant" below 15 $\mu g/m^3$, 2006 Final Rule, 71 Fed. Reg. at 61,172/3. Indeed, the 24-Cities Study predicted the children it examined might "continue on [a] track [of reduced] . . . growth of their lung function, as suggested by previous studies," Raizenne et al. at 513, which was consistent with the findings of the later Gauderman Study, *see* Gauderman et al. at 1388. The EPA also relied upon its 1997 conclusion that the 24-Cities Study does not show a statistically significant association between health effects and annual average concentrations of $PM_{2.5}$ below 15 $\mu g/m^3$. *See* 2006 Final Rule, 71 Fed. Reg. at 61,172/3. Viewed in isolation, of course, the studies are far from conclusive. Viewed together in the context of the studies the EPA considered when deciding whether to revise the standard for $PM_{2.5}$, however, the conclusion reached after comprehensive scientific review by the EPA's National Center for Environmental Assessment in the Criteria Document seems the only reasonable one: the findings of the Gauderman and 24-Cities studies are related and together indicate a significant public health risk. *See* CRITERIA DOCUMENT § 8.4.6.4, at 8-314; *cf.* 2006 Final Rule, 71 Fed. Reg. at 61,154/1 ("[T]he Criteria Document found that new studies of a cohort of children in Southern California have built upon earlier limited evidence to provide fairly strong evidence that long-term exposure to fine particles is associated with development of chronic respiratory disease and reduced lung function growth"). On this record, therefore, it appears the EPA too hastily discounted the Gauderman and 24-Cities studies as lacking in significance. *See Am. Radio Relay League, Inc. v. FCC*, 524

F.3d 227, 241 (D.C. Cir. 2008) (agency's inadequate explanation for dismissing empirical studies rendered decision arbitrary and capricious); *cf. ATA I*, 175 F.3d at 1052–53 (EPA arbitrarily and capriciously placed upon some studies "higher information threshold" than it placed upon others).

Second, the state petitioners argue the EPA should have explained how an annual standard of 15 $\mu$g/m$^3$ would provide an adequate margin of safety for vulnerable subpopulations, such as children, the elderly, or those with conditions that expose them to greater risk from fine particles. The EPA said there was insufficient evidence that vulnerable subpopulations will be exposed to adverse health effects at annual levels of PM lower than 15 $\mu$g/m$^3$. *See* 2006 Final Rule, 71 Fed. Reg. at 61,173/1. Having concluded the EPA failed adequately to consider the Gauderman and 24-Cities studies, however, we are constrained to agree with the state petitioners that the EPA was unreasonably confident that, even though it relied solely upon long-term mortality studies, the revised standard would provide an adequate margin of safety with respect to morbidity among children. Notably absent from the final rule, moreover, is any indication of how the standard will adequately reduce risks to the elderly or to those with certain heart or lung diseases despite (a) the EPA's determination in its proposed rule that those subpopulations are at greater risk from exposure to fine particles and (b) the evidence in the record supporting that determination. *See* 2006 Proposed Rule, 71 Fed. Reg. at 2637/1; STAFF PAPER § 3.3.2, at 3-19–22 & fig.3-2 (charting risk of morbidity for persons with various diseases, but noting associations between exposure to PM$_{2.5}$ and certain heart diseases and stroke are not "statistically significant"); CRITERIA DOCUMENT § 8.4.9, at 8-327–28 (citing studies discussing risks to "older adults and children"); ALA Comments at 52 (discussing risk to elderly at level of 12 $\mu$g/m$^3$). We therefore grant the petition for review and remand this matter for the EPA to explain why it believes

the NAAQS will provide, as required by the CAA, an adequate margin of safety against morbidity in children and other vulnerable subpopulations. *See Am. Lung Ass'n*, 134 F.3d at 393 (remanding because EPA had "failed adequately to explain [why there is] . . . no public health threat" to asthmatics).

## C.  Other Challenges

Both groups of petitioners object also to the EPA's analysis of the long-term studies; the state petitioners, furthermore, claim it was unreasonable of the agency not to rely upon the risk assessment.  We find neither objection persuasive.

First, the petitioners argue the EPA unreasonably focused upon the long-term mean ambient concentrations of $PM_{2.5}$ in the ACS Study (17.7 $\mu g/m^3$) and the Six Cities Study (18 $\mu g/m^3$) and then set a level below those concentrations to address long-term exposure.  *See* 2006 Final Rule, 71 Fed. Reg. at 61,176/2–3. The state and environmental petitioners claim this approach violates the requirement of the CAA that the NAAQS provide an "adequate margin of safety," 42 U.S.C. § 7409(b)(1), which requires that the EPA "err on the side of caution." *Lead Indus.*, 647 F.2d at 1154–55.  Because the most recent data from the ACS and the Six Cities studies showed adverse health effects in years when the mean ambient concentration of $PM_{2.5}$ was below 15 $\mu g/m^3$, *see* DANIEL KREWSKI ET AL., REANALYSIS OF THE HARVARD SIX CITIES STUDY AND THE AMERICAN CANCER SOCIETY STUDY OF PARTICULATE AIR POLLUTION AND MORTALITY: A SPECIAL REPORT OF THE INSTITUTE'S PARTICLE EPIDEMIOLOGY REANALYSIS PROJECT 175 (2000), the petitioners argue the EPA had to lower the level below 15 $\mu g/m^3$ in order to address the problem created by long-term exposure. They point to the staff's conclusion that the ACS and the Six Cities studies indicated an annual standard "somewhat below 15 $\mu g/m^3$." STAFF PAPER § 5.3.4.1, at 5-23.  As the staff and the

authors of the two studies explained, however, "it is not easy to differentiate the role of historic exposures from more recent exposures." *See id.* § 3.6.5.4, at 3-53. In other words, a person exposed to relatively high concentrations of $PM_{2.5}$ in the past may suffer long-term effects in the present even if he is exposed to relatively low concentrations of $PM_{2.5}$ in the present. The EPA, mindful of its obligation to set a standard "not lower or higher than is necessary . . . to protect the public health," *Whitman*, 531 U.S. at 475–76, reasonably decided to address long-term exposure with an annual standard somewhat below the long-term mean concentrations in the ACS and Six Cities studies. *See* 2006 Final Rule, 71 Fed. Reg. at 61,172–73. We approved a similar approach to assuring an adequate margin of safety in *ATA III* and we do so again here. *See* 283 F.3d at 372 (denying petition for review of standard set "just below the range of mean annual $PM_{2.5}$ concentrations observed in studies showing a statistically significant association between fine [PM] and health effects"). We therefore deny the petitions for review as to the EPA's analysis of the key long-term studies.

Second, the state petitioners object on four grounds to the EPA's decision not to rely upon a quantitative risk assessment, prepared for this rulemaking by Abt Associates, Inc. and analyzed and summarized in the EPA's staff paper, which estimated how variations in the ambient concentration of PM affect the incidence of adverse health effects. *See* 2006 Final Rule, 71 Fed. Reg. at 61,171/2–3. First, if a threshold of 7.5 $\mu g/m^3$ is assumed as the level below which exposure to PM is not harmful, then the risk assessment predicts the EPA's standards will result in 3,700 premature deaths in the nine cities studied, whereas lowering the primary annual standard to 12 $\mu g/m^3$, as the petitioners suggest the EPA should do, may reduce that number by 80%. *See* RISK ASSESSMENT at 117, E-17–31; *see also* ALA Comments at 40 fig.4 (synthesizing data). The EPA reasonably responds, however, that the comparison

between the petitioners' preferred NAAQS and the one the EPA selected is based upon unreliable assumptions; in particular, the risk assessment is "based on studies that do not resolve the issue [whether there is] a threshold" below which $PM_{2.5}$ is harmless. *See* 2006 Final Rule, 71 Fed. Reg. at 61,168/2. The risk assessment therefore "necessarily predicts that ever lower standards result in ever lower risks," which is not supported by statistically significant epidemiological evidence. *Id.*

The state petitioners also claim the EPA is inconsistent because it relied upon a risk assessment when setting the annual standard for PM in 1997. Although the EPA stated the risk assessment then before it contained "reasonable estimates . . . given the available information," it did not in fact use those estimates to set the annual standard. *See* 1997 Final Rule, 62 Fed. Reg. at 38,656/2–3. Indeed, the EPA expressed the same concern about the earlier risk assessment that it has about the new one. We deferred to its decision then not to rely upon the risk assessment in setting the level of the NAAQS. *See ATA III*, 283 F.3d at 374 ("EPA persuasively explains that it discounted the quantitative predictions of the risk assessment in light of 'inherent scientific uncertainties,' including the 'possibility of . . . thresholds' below which $PM_{2.5}$ has little or no effect").

The state petitioners nonetheless argue we should not similarly defer now because the current risk assessment is more reliable than the one available in 1997; this time the staff used "only health endpoints for which . . . the overall weight of the evidence supports the conclusion that $PM_{2.5}$ is likely causally related." STAFF PAPER § 4.3.4, at 4-34. They note both the CASAC and the staff thought the risk assessment was reliable. *See* CASAC Mar. 21 Letter at 3; STAFF PAPER § 5.3.7, at 5-46. Even so we must defer to the EPA's assessment of "scientific data within its technical expertise" as long as the agency has examined the data and adequately explained itself. *City of*

*Waukesha*, 320 F.3d at 247 (internal quotation marks omitted). Here, unlike in its analysis of vulnerable subpopulations, the EPA considered all aspects of the problem, catalogued its concerns, and took the same decision — not to rely upon the risk assessment — it took before; we deferred to that decision before and we do so again now.

Finally, the state petitioners argue the EPA contradicted itself when it relied upon the ACS and the Six Cities studies but not upon the risk assessment, which was based in part upon those studies. The record, however, indicates the risk assessment magnified the uncertainties inherent in the underlying studies. *See* STAFF PAPER § 4.3.4, at 4-34 (reliance of risk assessment upon single-city studies in addition to multi-city studies introduces additional uncertainty). Moreover, the EPA's decision not to rely upon the lower mean concentrations in the multi-city studies is consistent with its decision that the risk assessment overestimated the risk of harm from lower concentrations. We cannot say the EPA's distinction between the studies and the risk assessment was unreasonable.

Because we believe the EPA reasonably analyzed the risk assessment, we deny the petition for review in that respect. We do not reach the industry intervenors' defense of the EPA's action — except to note it was repudiated by the agency. *See State Farm*, 463 U.S. at 50 (court can look only to "basis articulated by the agency"); EPA, Responses to Significant Comments, 2006 Rulemaking, Pub. Dkt. No. OAR-2001-0017-3203, at 166–67 (filed Sept. 25, 2006).

D.  Conclusion

In sum, the EPA did not adequately explain why an annual level of 15 $\mu g/m^3$ is sufficient to protect the public health while providing an adequate margin of safety from short-term

exposures and from morbidity affecting vulnerable subpopulations. We therefore grant in part the petitions for review filed by the States and by the environmental petitioners (Nos. 06-1416 and 06-1411) and remand for reconsideration the primary annual NAAQS for $PM_{2.5}$. We deny the same petitions insofar as they seek review of the EPA's analysis of the long-term mortality studies and the agency's decision not to rely upon the risk assessment. We do not, however, vacate the annual standard. First, the EPA's failure adequately to explain itself is in principle a curable defect. Second, vacating a standard because it may be insufficiently protective would sacrifice such protection as it now provides, making the best an enemy of the good. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (when selecting remedy court should consider: "the seriousness of the [rule's] deficiencies . . . and the disruptive consequences of an interim change that may itself be changed" (internal quotation marks omitted)).

## III.

The environmental petitioners challenge as arbitrary and capricious the EPA's decision to set the secondary NAAQS for fine PM, which protect the public welfare from adverse visibility effects, at the same level as the primary NAAQS, which protect public health.

The EPA staff and the CASAC recommended a secondary standard level of 20 to 30 $\mu g/m^3$ of $PM_{2.5}$, averaged across a 4- or 8-hour midday period each day, and using the 92nd to 98th percentile of these daily measurements. Both groups explained that this standard would be shielded from the confounding effects of humidity. Because both humidity and fine PM can impair visibility, measuring PM concentration only at midday, when humidity is lowest, would ensure that the standard is

targeting visibility effects caused by fine PM rather than by humidity. The EPA staff and the CASAC based the recommended ranges of levels and percentile forms on studies in which participants rated the acceptability of visibility levels as depicted in actual photographs or computer-generated simulations. In each study, a majority of participants rated visibility ranges of 40 to 60 kilometers as "acceptable." The EPA staff explained that the recommended standard was "consistent with" this target range.

The EPA rejected these recommendations. Although it agreed with its staff and the CASAC that a sub-daily averaging time had "strong technical merit," the EPA characterized the evidence supporting the recommended level and form as "limited and uncertain," a conclusion based on "the generally subjective nature of the public welfare effect involved." 2006 Final Rule, 71 Fed. Reg. at 61,206–08. Having rejected the recommended target level of visibility protection, the EPA did not identify its own. Instead, it first considered the extent to which the revised primary NAAQS would protect visibility and compared this with the protection that would be provided by the recommended secondary standard.

To make this comparison, the EPA looked to two tables in the Staff Paper predicting the percentage of counties where the existing air quality was unlikely to meet several potential standards. One table showed that 27% of counties contained PM monitors with a recent history of recorded fine PM levels that would not meet the new primary PM NAAQS. The second table showed that 24% of counties contained PM monitors with a record of fine PM levels that would not meet one possible standard within the range recommended by the EPA staff and the CASAC. From this data, the EPA concluded that the primary NAAQS would be more protective of visibility than the standard recommended by its staff and the CASAC. Because a

greater percentage of counties would fail to meet those standards, more counties would be required under the CAA to reduce fine PM levels and, incidentally, improve visibility. Accordingly, the EPA adopted secondary fine PM NAAQS identical to the primary fine PM NAAQS.

The petitioners argue that the EPA's decision lacks a reasoned basis. First, they assert that the EPA never determined what level of visibility is "requisite to protect the public welfare." 42 U.S.C. § 7409(b)(2). The petitioners argue that the EPA unreasonably rejected the starting point provided by its staff — visibility of 40 to 60 kilometers — based on the inherent "uncertainty" in subjective value judgments about visibility. Second, the petitioners challenge the EPA's method of comparing the protection expected from potential standards. They contend that the EPA relied on a meaningless numerical comparison, ignored the effect of humidity on the usefulness of a standard using a daily averaging time, and unreasonably concluded that the primary standards will achieve a level of visibility roughly equivalent to the level the EPA staff and the CASAC deemed "requisite to protect the public welfare." *Id.*

The EPA responds that it did not need to identify a specific level of visibility to achieve because the evidence did not support a need for secondary standards to be more stringent than the primary standards. Moreover, the EPA argues that it was reasonable to reject the target level of visibility recommended by the Staff Paper because it relied on the subjective perspectives of study participants. The EPA characterizes this subjective evidence as "uncertain" because the studies could not identify the precise level or percentage of days of visibility impairment at which there is an adverse effect on public welfare. Such uncertain evidence, the EPA argues, cannot substitute for the sound policy judgment of the EPA Administrator. Finally, the EPA defends its reliance on the comparative analysis of the

protection afforded by different standards: it claims it did not rely solely on the finding of equivalent protection, but also found that the primary standards were in fact within the range recommended by the EPA staff and the CASAC.

The EPA's assertion that it need not determine what level of visibility protection is requisite to protect the public welfare fails under the plain language of the statute. The CAA provides: "Any national secondary ambient air quality standard *shall specify a level of air quality* the attainment and maintenance of which . . . *is requisite to protect the public welfare* from any known or anticipated adverse effects . . . ." 42 U.S.C. § 7409(b)(2) (emphases added). The EPA's failure to identify such a level when deciding where to set the level of air quality required by the revised secondary fine PM NAAQS is contrary to the statute and therefore unlawful. Furthermore, the failure to set any target level of visibility protection deprived the EPA's decisionmaking of a reasoned basis. Because the EPA failed to identify any target level, we need not decide whether it was reasonable for the agency to reject the target recommended by the Staff Paper and the CASAC because it was based on uncertain subjective evidence.

The EPA's substitute for identifying a target level — its analysis of the relative protection expected from the recommended standards and the revised primary NAAQS — cannot save its decision. The equivalence analysis fails on its own terms. The EPA compared the predicted 27% of counties that would not meet the revised primary fine PM standards with the predicted 24% that would not meet a standard of 30 $\mu g/m^3$ using a 4-hour averaging time and a 95th percentile form — one standard within the range recommended by the CASAC. The EPA concluded that because fewer counties would meet the primary standards, and would therefore have to take steps to reduce fine PM levels, that standard was more protective than

the one recommended by the CASAC. But the same table shows that six other standards within the recommended range would be more "protective" under the EPA's definition than the primary standards: from 47% to 85% of counties would not meet these alternative standards. The alternative cited by the EPA is one of only three standards that would offer equal or greater protection than the primary standards. In other words, two-thirds of the potential standards within the CASAC's recommended range would be substantially more protective than the primary standards. The EPA failed to explain why it looked only at one of the few potential standards that would be less protective — and only slightly so — than the primary standards.

More fundamentally, however, the EPA's equivalence analysis demonstrates nothing about the relative protection offered by the different standards. The CASAC put the EPA on notice of this fact in a letter submitted in response to the proposed revisions to the NAAQS: "The cited comparability between percentages of counties not likely to meet a lenient sub-daily secondary standard and the proposed 24-hour primary standard is a numerical coincidence." CASAC Mar. 21 Letter at 5. Indeed, the tables both state that the "estimates are not based on the same air quality data that would be used to determine whether an area would attain a given standard or set of standards" and "should be interpreted with caution." STAFF PAPER app. 5B at 2, app. 7A at 2. The tables simply offer no valid information about the relative visibility protection provided by the standards, and yet the EPA relied on them almost exclusively in selecting the secondary NAAQS for fine PM.

Finally, as the Staff Paper makes clear, a visibility standard using a daily averaging time will be confounded by regional differences in humidity. The EPA acknowledged this problem, recognizing that a sub-daily averaging time, using the daylight

hours when humidity tends to be lowest, has "strong technical merit." 2006 Final Rule, 71 Fed. Reg. at 61,208. Yet the EPA's equivalence analysis — its basis for concluding that the primary standards would be sufficiently protective of visibility — did not address this issue at all.

The EPA's decision to set secondary fine PM NAAQS identical to the primary NAAQS was unreasonable and contrary to the requirements of 42 U.S.C. § 7409(b)(2). Accordingly, we grant the petition for review (No. 06-1411) and remand for reconsideration the secondary NAAQS for fine PM.

IV.

The industry petitioners lodge three challenges to the EPA's regulation of coarse PM. First, they challenge the EPA's decision to retain a daily standard for all coarse PM, including that in nonurban areas. Second, they claim that the 150 μg/m$^3$ daily NAAQS that the EPA set is not requisite to protect public health under *Whitman v. American Trucking*, 531 U.S. 457. Finally, they argue that the $PM_{10}$ indicator that the EPA chose to retain for coarse PM is confounded and impermissible under this court's decision in *ATA I*, 175 F.3d 1027. We find the EPA's decisions on all three issues to be reasonable, and we therefore deny these petitions (Nos. 06-1410, 06-1415, and 06-1417).

A. Retention of a Daily Standard for All Coarse PM

In their challenge to the EPA's decision to maintain a daily NAAQS for all — not just urban — coarse PM, the industry petitioners make two arguments, one contesting the EPA's authority to regulate nonurban coarse PM and the other contesting its evidence of coarse PM's dangerousness.

First, the industry petitioners contend that, "to promulgate a NAAQS for nonurban PM coarse, the EPA must show that

such particles present a significant risk to public health." Industry Reply Br. 4. To support this contention, the petitioners rely on 42 U.S.C. § 7408(a)(1), which states:

> For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall . . . publish, and shall from time to time thereafter revise, a list which includes each air pollutant — (A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.

On the basis of this section, the petitioners argue that the EPA lacks authority to establish a NAAQS for coarse PM that includes nonurban coarse PM unless the agency first makes a finding that such nonurban coarse PM "may reasonably be anticipated to endanger public health or welfare." *Id.*

The petitioners misunderstand § 7408(a)(1). Under that section, the EPA must make a dangerousness finding in order to place a pollutant on the list of pollutants regulated by NAAQS. But that requirement to find dangerousness does not apply when the EPA sets the NAAQS for a pollutant already on the list. At issue in this review is not the listing of PM, but rather the review and revision of the PM NAAQS that was mandated by § 7409(d)(1). *See id.* § 7409(d)(1) ("Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section").

In *ATA I*, this court confirmed that the establishment of an

indicator for $PM_{2.5}$ was not a new listing under § 7408(a)(1) because $PM_{2.5}$ had previously been regulated as part of the $PM_{10}$ indicator. *ATA I*, 175 F.3d at 1055. Similarly, nonurban $PM_{10}$ has been regulated under the general $PM_{10}$ standard, and therefore the EPA's continued regulation of all $PM_{10}$ is not a new listing that would require an endangerment finding under § 7408(a)(1).

The industry petitioners also seek support for their lack-of-authority claim in the Supreme Court's opinion in *Whitman*. In particular, they argue that *Whitman*'s citation of *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980), a case that addressed a provision of the Occupational Safety and Health (OSH) Act of 1970, means that "a NAAQS is 'requisite' to protect public health only if EPA has made a threshold showing of real and significant risk." Industry Br. 16. But *Whitman* compared the specificity of the CAA to that of the OSH Act — citing *Industrial Union* in the course of that comparison — solely for the purpose of deciding whether the CAA violated the nondelegation doctrine, *Whitman*, 531 U.S. at 473-74, a purpose not relevant here. It did not suggest that *Industrial Union* has any implication for the EPA's exercise of its authority under section 109 of the CAA. The industry petitioners' contention that the EPA lacks authority to regulate nonurban $PM_{10}$ therefore lacks merit.

The industry petitioners' second argument against the EPA's regulation of nonurban coarse is that scientific evidence "shows that nonurban coarse PM is *not* associated with adverse health effects." Industry Br. 17. Drawing on statements in the final rule, the petitioners argue that the scientific evidence shows danger only from urban coarse, and not from nonurban coarse. *See* 2006 Final Rule, 71 Fed. Reg. at 61,185-86. The petitioners argue both that scientific evidence demonstrates that nonurban coarse PM is not dangerous and that the EPA's "cautious

approach" is unlawful absent evidence of nonurban coarse PM's dangerousness. Industry Br. 17-22.

In assessing the scientific evidence, the petitioners have mistakenly equated an absence of certainty about dangerousness with the existence of certainty about safety. The petitioners selectively quote from the final rule to bolster their argument that nonurban coarse is not dangerous, *see id.* at 19, but they ignore passages that weaken the force of their contention. For example, the petitioners note that studies of exposure to coarse PM from dust storms do not show significant health effects. 2006 Final Rule, 71 Fed. Reg. at 61,186; Industry Br. 18. But the petitioners ignore the EPA's qualifier on the dust storm studies: people in such situations may practice avoidance behavior and limit their exposure to the dust. 2006 Final Rule, 71 Fed. Reg. at 61,191. The petitioners similarly quote the portion of the final rule that discusses the lack of health impacts observed in studies focusing on volcanic ash from Mt. St. Helens, *id.*; Industry Br. 19, but omit the subsequent discussion of possibilities for toxic contamination in more typical nonurban coarse PM. 2006 Final Rule, 71 Fed. Reg. at 61,191.

By contrast, the EPA has provided evidence that suggests nonurban coarse PM likely is not safe. The EPA points to dosimetric, toxicological, and occupational exposure studies that all indicate danger from nonurban coarse. EPA Br. 95-97. Dosimetric evidence shows that all types of coarse PM can deposit in the "sensitive regions of the lung of most concern, the tracheobronchial and alveolar regions." 2006 Final Rule, 71 Fed. Reg. at 61,197. Toxicological evidence demonstrates that all types of coarse can be contaminated by motor vehicles and industrial emissions, molds, fungi, endotoxins, polycyclic aromatic hydrocarbons (PAHs), and resuspended fine PM. *Id.* at 61,189-92. Some rural coarse, such as that found in dry lakebeds, may also "be highly contaminated with metals, salts,

and other toxic constituents." *Id.* at 61,191. The EPA notes that contamination means there is not a clear division between urban and nonurban coarse; rather "there is a continuum of sources and contamination, so that the difference between them is a question of degree." EPA Br. 96. In addition, occupational studies showing health effects from nonurban coarse at occupational exposure levels "lend[] further support to a cautious approach in considering revisions to the standards affording protection from thoracic coarse particles." 2006 Final Rule, 71 Fed. Reg. at 61,191.

Although the evidence of danger from coarse PM is, as the EPA recognizes, "inconclusive," *id.* at 61,193, the agency need not wait for conclusive findings before regulating a pollutant it reasonably believes may pose a significant risk to public health. The evidence in the record supports the EPA's cautious decision that "some protection from exposure to thoracic coarse particles is warranted in all areas." *Id.* As this court has consistently reaffirmed, the CAA permits the Administrator to "err on the side of caution" in setting NAAQS. *Lead Indus.*, 647 F.3d at 1155; *see also ATA III*, 283 F.3d at 369 ("The [Clean Air] Act requires EPA to promulgate protective primary NAAQS even where, as here, the pollutant's risks cannot be quantified or 'precisely identified as to nature or degree'" (quoting 1997 Final Rule, 62 Fed. Reg. at 38,653)); *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1186 (D.C. Cir. 1981) ("In setting margins of safety the Administrator need not regulate only the known dangers to health, but may 'err' on the side of overprotection by setting a fully adequate margin of safety").

This court's role is "limited to determining if the Administrator made a rational judgment" and is "not to weigh the evidence anew and make technical judgments." *Am. Petroleum Inst.*, 665 F.2d at 1185. On the basis of the evidence in the record, we find the Administrator's decision to regulate all

coarse PM to be rational and therefore deny the industry petitioners' claims on this issue.

## B. Level of the Daily Coarse PM NAAQS

The industry petitioners next challenge the level of the daily coarse PM standard. The EPA used PM$_{10}$ as the indicator for coarse PM and set the 24-hour coarse PM standard at 150 µg/m$^3$, the same level it retained in the 1997 NAAQS revision. *See* 1997 Final Rule, 62 Fed. Reg. at 38,679. It did not differentiate between urban and nonurban coarse particles.

The industry petitioners first contend that the agency should have set "different limits for urban and nonurban PM coarse." Industry Br. 27. In response, the EPA maintains that it is not possible, given the "current state of science," to set different standards for urban and nonurban areas because there is no reliable way to determine which ambient mixes are urban and which are nonurban. 2006 Final Rule, 71 Fed. Reg. at 61,195. The agency explains that, "given the variety of sources contributing to PM$_{10-2.5}$ concentrations in different locations, a wide variety of 'ambient mixes' are likely to exist, greatly complicating the determination of the appropriate standard level for each location." *Id.* The agency further notes that "there is insufficient evidence regarding coarse particle composition in different areas to allow for the proper assignment of different standard levels in different locations, and the technical capabilities necessary to make such determinations are currently lacking." *Id.* This is a reasonable explanation for declining to set different levels for "urban" and "nonurban" coarse. Because we affirm the EPA's decision not to set different urban and nonurban coarse PM standards, we do not reach the argument of the amicus National Association of Home Builders that the EPA does not have the authority to set different NAAQS for urban areas or for different emissions sources. *See* NAHB Amicus Br.

2-6.

The industry petitioners also contend that the EPA's single standard of 150 μg/m$^3$ is not requisite to protect the public health. Again, the EPA has a reasonable response. The EPA explains that the Staff Paper undertook an examination of epidemiologic studies, and that the studies showed mortality and morbidity effects in areas that exceed the 150 μg/m$^3$ standard. 2006 Final Rule, 71 Fed. Reg. at 61,200 ("[T]he Staff Paper found little basis for concluding that the degree of protection afforded by the current PM$_{10}$ standards in urban areas is greater than warranted, since potential mortality effects have been associated with air quality levels not allowed by the current 24-hour standard, but have not been associated with air quality levels that would generally meet that standard, and morbidity effects have been associated with air quality levels that exceeded the current 24-hour standard only a few times"); *see also* STAFF PAPER § 5.4.4.1, at 5-67. The Administrator agreed with the Staff Paper's findings, and on that basis concluded that the 150 μg/m$^3$ standard did not provide more protection than necessary. 2006 Final Rule, 71 Fed. Reg. at 61,202. The Administrator further concluded that the "very high degree of uncertainty in the relevant population exposures implied by the morbidity studies suggests there is little basis for concluding at this time that a greater degree of protection is warranted." *Id.*

The industry petitioners next argue that the 150 μg/m$^3$ standard for PM$_{10}$ will result in arbitrarily varying levels of coarse PM, and that the agency should instead have used a PM$_{10-2.5}$ indicator. The EPA does not dispute that using the PM$_{10}$ indicator will result in coarse PM levels that vary within the limit of 150 μg/m$^3$. As the EPA explains: "Because the PM$_{10}$ indicator includes both coarse PM (PM$_{10-2.5}$) and fine PM (PM$_{2.5}$), the concentration of PM$_{10-2.5}$ allowed by a PM$_{10}$ standard set at a single level declines as the concentration of PM$_{2.5}$ increases.

Thus, the level of coarse particles allowed varies depending on the level of fine particles present." *Id.* at 61,195.

Although the EPA acknowledges that a $PM_{10}$ indicator will result in varying coarse PM levels, it does not agree that the variance will be arbitrary. The EPA agrees with the industry petitioners that protection from coarse particles should be targeted at urban areas, where coarse particles have been shown to pose the greatest danger. *Id.* at 61,194. But the agency argues that targeting of urban areas is effectively accomplished by using an indicator that permits the varying levels that the industry petitioners challenge. As the EPA explains:

> $PM_{2.5}$ levels tend to be lower in rural areas and higher in urban areas. Thus, to the extent that higher $PM_{2.5}$ levels lead to a lower allowable level of coarse particles in some areas compared to others, this will occur in precisely those locations — *i.e.* urban or industrial areas — where the science has shown the strongest evidence of adverse health effects associated with exposure to coarse particles.

*Id.* at 61,195-96 (citations omitted). In other words: "The varying levels of coarse particles allowed by a $PM_{10}$ indicator will therefore target protection in urban and industrial areas where the evidence of adverse health effects associated with exposure to coarse particles is strongest." *Id.*

The EPA also offers a further rationale for tying the stringency of coarse PM regulation to increases in the level of $PM_{2.5}$. The EPA explains that the contamination of coarse particles discussed above, which makes such particles more dangerous to health, is linked to the presence of fine PM. Specifically, "[m]any of these contaminants in $PM_{10-2.5}$ come originally from fine particles, which may become attached in the atmosphere or be deposited and mixed into coarse materials on

the ground." *Id.* Because contamination increases the health risks posed by coarse particles, the EPA argues that it is "logical to allow lower levels of coarse particles when fine particle concentrations are high. . . . [I]nclusion of $PM_{2.5}$ in the $PM_{10}$ indicator for purposes of coarse particle protection would appropriately reflect the contribution that contaminants emitted in fine particle form can make to the overall health risk posed by coarse particles." *Id.* Thus, "inclusion of the $PM_{2.5}$ fraction in the $PM_{10}$ indicator . . . ensures that this risk of contamination of coarse particles by $PM_{2.5}$ is addressed in the suite of fine and coarse PM standards." *Id.*

It is true that the EPA relies on a qualitative analysis to describe the protection the coarse PM NAAQS will provide. But the fact that the EPA's analysis is qualitative rather than quantitative does not undermine its validity as an acceptable rationale for the EPA's decision. As this court held in *ATA III*, "[t]he [Clean Air] Act requires EPA to promulgate protective primary NAAQS even where, as here, the pollutant's risks cannot be quantified or 'precisely identified as to nature or degree.'" 283 F.3d at 369 (quoting 1997 Final Rule, 62 Fed. Reg. at 38,653). The EPA's qualitative explanation for the targeting capacity of the 150 μg/m³ $PM_{10}$ standard is reasonable and warrants rejection of the petitioners' challenge on this point.

In sum, we find that the EPA has provided a reasonable explanation for its decisions not to set separate urban and nonurban coarse PM standards, to set the single coarse PM standard at 150 μg/m³, and to utilize a standard that allows targeted variance in coarse PM levels in an inverse relationship to the amount of fine PM in the air. Consequently, we reject the industry petitioners' challenge to the level of the coarse PM standard.

## C. Choice of the PM$_{10}$ Indicator

The industry petitioners also level a direct challenge to the EPA's choice of the PM$_{10}$ indicator — a challenge that significantly overlaps with that addressed in Part IV.B above. The EPA initially proposed using a PM$_{10-2.5}$ indicator instead of a PM$_{10}$ indicator. *See* 2006 Proposed Rule, 71 Fed. Reg. at 2665-68. The PM$_{10-2.5}$ indicator would have measured only the coarse fraction (PM$_{10-2.5}$) of PM smaller than 10 μg, *see id.*, and would have disposed of concerns about the PM$_{10}$ indicator that this court raised in *ATA I*. *See* 175 F.3d at 1054-55. In response to comments expressing concern with the PM$_{10-2.5}$ indicator, *see* 2006 Final Rule, 71 Fed. Reg. at 61,188-94, the EPA's final rule reverted to the PM$_{10}$ indicator that the agency had adopted in the 1997 NAAQS review. *Id.* at 61,194-99.

The petitioners challenge the PM$_{10}$ indicator on three grounds. First, they argue that *ATA I* holds that the PM$_{10}$ indicator is "inherently confounded," and that no explanation by the EPA for the indicator's utility could make it acceptable. Industry Reply Br. 13-14. For support, the petitioners rely on the court's statement that "it is the very presence of a separate PM$_{2.5}$ standard that makes retention of the PM$_{10}$ indicator arbitrary and capricious." *ATA I*, 175 F.3d at 1054. But *ATA I* did not definitively preclude the use of a PM$_{10}$ indicator. It held only that the EPA had not offered an adequate explanation to "aid us in understanding its decision" to select PM$_{10}$ as the indicator for coarse PM. *Id.* Without that explanation, we were constrained to conclude the PM$_{10}$ and PM$_{2.5}$ indicators could lead to arbitrary "'double regulation' of the PM$_{2.5}$ component of PM$_{10}$ and potential underregulation of the PM$_{10-2.5}$ component." *Id.* As recounted in Part IV.B, the EPA has now cured that failure of explanation and provided a reasonable rationale for its choice of PM$_{10}$. *See* 2006 Final Rule, 71 Fed. Reg. at 61,193-97; EPA Br. 107.

Second, the industry petitioners argue that the EPA's choice of a $PM_{10}$ indicator also runs afoul of *ATA I* because it was based solely on reasons of administrative convenience, which *ATA I* found impermissible. *ATA I*, 175 F.3d at 1055 ("The administrative convenience of using $PM_{10}$ cannot justify choosing an indicator poorly matched to the relevant pollution agent"). This time, however, the EPA expressly disavowed reliance upon administrative convenience, 2006 Final Rule, 71 Fed. Reg. at 61,195, and chose the $PM_{10}$ indicator only after considering and rejecting alternatives on the basis of flaws discerned during the comment period. *Id.* at 61,193-97. For example, the final rule explains that an unqualified $PM_{10-2.5}$ indicator would not have been "requisite" because it would have been too stringent in nonurban areas and insufficiently stringent in urban areas. As discussed above, the agency rejected a qualified indicator — one with different levels for urban and nonurban areas — because "determining appropriate levels for different kinds of ambient mixes is not feasible at this time." *Id.* at 61,195; *see also id.* at 61,193. Finally, as also discussed above, the EPA explained its choice of $PM_{10}$ on scientific rather than administrative grounds: $PM_{10}$ allows for targeting regulation of $PM_{10-2.5}$ concentrations in those areas that experience high concentrations of $PM_{2.5}$, which can contaminate — and thus render more dangerous — coarse PM. *Id.* at 61,196-97.

Third, the petitioners argue that the $PM_{10}$ standard will overregulate — or rather, double-regulate — fine particles because such particles are also subject to the $PM_{2.5}$ standard. The discussion in Part IV.B, however, rebuts this argument as well. As we concluded there, the EPA has reasonably explained that the variance allowed by the $PM_{10}$ indicator will target protection by allowing less coarse PM in areas that experience high concentrations of potentially contaminating fine PM. *Id.* at

61,196. This will not double-regulate $PM_{2.5}$. Fine PM will primarily be regulated via the newly tightened daily $PM_{2.5}$ standard. *Id.* at 61,196 n.72. Any residual regulation of $PM_{2.5}$ by the $PM_{10}$ standard will serve a different, "non-duplicative purpose[] in providing requisite protection from thoracic coarse particles" that can be contaminated by $PM_{2.5}$. *Id.* at 61,196. Moreover, the petitioners' over-regulation argument wrongly assumes that an area in violation of the $PM_{10}$ coarse standard must decrease the fine fraction of PM to achieve compliance with the standard. Such an area could, however, simply choose to decrease the amount of coarse PM ($PM_{10-2.5}$), a choice that would yield no additional "regulation" of fine PM.

For the foregoing reasons, we reject these and all of the industry petitioners' other objections to the EPA's revised NAAQS for coarse PM and deny their petitions for review.

V.

Finally, the environmental petitioners challenge the EPA's revocation of the primary annual standard for coarse PM. The petitioners argue that the CAA prohibits the EPA from revoking this standard. Alternatively, they argue that the EPA's justification for the revocation was arbitrary and capricious. We reject both arguments.

The statutory provision at issue, 42 U.S.C. § 7513(d)(2), was enacted as part of the 1990 amendments to the CAA. In those amendments, the Congress created a detailed enforcement scheme to require that areas not in compliance with the NAAQS (nonattainment areas) make faster progress toward meeting that goal. The amendments established a procedure for classifying nonattainment areas and setting the date by which an area must attain compliance with the NAAQS. An area that is classified as "moderate nonattainment" for coarse PM may receive a one-year extension of its attainment date if certain criteria are met:

Upon application by any State, the Administrator may extend for 1 additional year . . . the date [for attainment] if:

(1) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan; and
(2) no more than one exceedance of the 24-hour national ambient air quality standard level for PM-10 has occurred in the area in the year preceding the Extension Year, *and the annual mean concentration of PM-10 in the area for such year is less than or equal to the standard level.*

*Id.* § 7513 (emphasis added).

Despite the explicit statutory reference to an annual standard level of $PM_{10}$, the EPA decided to revoke the $PM_{10}$ annual standards while leaving in place the 24-hour standards. The EPA interpreted the CAA to permit this revocation. We review the EPA's interpretation under the familiar standard set forth by the Supreme Court in *Chevron. See* 467 U.S. at 842–43.

The EPA argues that the CAA does not unambiguously require an annual standard for coarse PM and that its reading of the statute is reasonable under *Chevron* step two. The EPA relies primarily on this court's decision in *ATA I*, in which we held that the 1990 amendments, which referenced the existing primary ozone standards, did not eliminate the agency's authority to revise those standards. *See* 175 F.3d at 1047–48.

The petitioners argue that the EPA's action fails at step one of the *Chevron* analysis because the 1990 amendments to the CAA codified the use of an annual averaging time for the coarse PM standard. The petitioners argue that the reference in § 7513(d)(2) to a standard "annual mean concentration of

[PM$_{10}$]" means that the EPA must have in place an annual PM$_{10}$ standard.

The EPA is correct that this court's precedent forecloses the petitioners' statutory argument; the decisive case, however, is not *ATA I* but *South Coast Air Quality Management District v. EPA*, 472 F.3d 882 (D.C. Cir. 2006). Whereas *ATA I* dealt with the EPA's authority to revise the ozone standards in light of the 1990 amendments, *South Coast* considered the agency's ability to revoke a standard explicitly referenced by the text of those amendments. The EPA had revoked the primary one-hour standard for ozone and replaced it with a standard using an eight-hour averaging time. The petitioners in *South Coast* pointed to 42 U.S.C. § 7511(a)(1), tbl.1, which sets out a scheme for classifying areas into varying levels of nonattainment based on the extent of their noncompliance with the one-hour ozone standard in existence at the time. The petitioners argued that the EPA could not revoke the one-hour standard because the Congress had codified it as part of the 1990 amendments. *See South Coast*, 472 F.3d at 899. We rejected this argument, explaining that the "Congress contemplated . . . the possibility that scientific advances would require amending the NAAQS." *Id.* Indeed, the 1990 amendments left intact § 7409(d)(1), which directs the EPA to "complete a thorough review" of the NAAQS every five years and to "make such revisions . . . as may be appropriate." Furthermore, another provision of the CAA "regulates what EPA must do with revoked restrictions." *South Coast*, 472 F.3d at 899; *see* 42 U.S.C. § 7502(e) (requiring EPA to promulgate so-called "anti-backsliding" regulations in the event that the agency relaxes a NAAQS).

The petitioners here have failed to distinguish this case from *South Coast*. As we explained there, it would frustrate the purpose of the CAA to read the 1990 amendments as limiting the EPA's ability to revise the NAAQS based on advances in

scientific understanding. The EPA still must review the NAAQS every five years and make appropriate revisions, including revoking a standard no longer warranted by the current scientific understanding. *See* 42 U.S.C. § 7409(d)(1). In *South Coast*, we held that the amendments' incorporation of the existing one-hour ozone standard did not prevent the EPA from revoking that standard and replacing it with one based on an eight-hour averaging time. Likewise, in this case, the reference in the 1990 amendments to an annual mean standard for $PM_{10}$ does not require the EPA to maintain an annual standard in the face of scientific evidence counseling revocation. We reject the petitioners' argument to the contrary.

The petitioners alternatively argue that, even if the EPA had the authority to revoke the annual coarse PM standard, its decision to do so was arbitrary and capricious because it was an unreasonable departure from the agency's past practice and was not based on the record. The petitioners point to the EPA's 1997 revision to the PM NAAQS, in which the agency explained that the annual coarse PM standard would "provide substantial protection against short-term as well as long-term exposures to particles." 1997 Final Rule, 62 Fed. Reg. at 38,676. The petitioners argue that, in light of the EPA's previous decision to control both short- and long-term exposure through the annual standard, it was unreasonable for the EPA to revoke the annual standard based only on the lack of adverse effects from long-term exposure. The petitioners further assert that scientific evidence still demonstrates an association between short-term exposure to coarse PM and negative health effects.

But as the EPA points out, the petitioners have forfeited their argument that an annual standard reduces the risk from short-term exposure. The CAA provides that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public

comment . . . may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B); *see also Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998) ("The purpose of the exhaustion requirement is to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule").  In the comments submitted in response to the EPA's proposed revocation of the annual standard, the environmental petitioners argued only that the record evidence demonstrated adverse effects from *long-term* coarse PM exposure; they did not raise their current argument that an annual standard is necessary to prevent adverse effects from *short-term* exposure.

The EPA reasonably decided that an annual coarse PM standard is not necessary because, as the Criteria Document and the Staff Paper make clear, the latest scientific data do not indicate that long-term exposure to coarse particles poses a health risk.  The CASAC also agreed that an annual coarse PM standard is unnecessary.  We deny the petition for review (No. 06-1411) with regard to the revocation of the annual coarse PM standard.

## VI.

For the foregoing reasons, we grant in part the petitions for review of the EPA's primary annual fine PM standard.  We grant in full the environmental petitioners' petition for review of the EPA's secondary fine PM NAAQS.  In all other respects, the petitions for review are denied.

*So ordered.*